[No. B175996. Second Dist., Div. Four. Mar. 3, 2005.]

STEVEN S., Plaintiff and Respondent, v.
DEBORAH D., Defendant and Appellant.

320

## COUNSEL

Marjorie G. Fuller and Glen H. Schwartz for Defendant and Appellant.

Kenneth R. Nahigian for Plaintiff and Respondent.

OPINION

**HASTINGS, J.—**

## BACKGROUND

This case involves application of Family Code section 7613, subdivision (b), which provides: "The donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived."[1]

On March 12, 2003, Steven S. filed a verified petition to establish a parental relationship with Trevor, then approximately three years old. Deborah D., Trevor's mother, contested the petition alleging that Trevor was conceived by artificial insemination within the terms of section 7613, subdivision (b), and therefore Steven was not entitled to any rights as a natural father.

The trial court bifurcated the issue of paternity from the remainder of the issues and heard conflicting evidence relating to the conception of Trevor. Summarizing, the evidence establishes that Deborah and Steven, who are not and were not married to each other, agreed Steven would provide semen to a physician to artificially inseminate Deborah; Deborah became pregnant from the artificial insemination but the pregnancy did not last full term; Steven and Deborah then had sexual intercourse over a period of months which did not result in a pregnancy; shortly after terminating the sexual relationship, Deborah again sought to conceive through artificial insemination utilizing sperm Steven had originally provided for that purpose; Deborah again became pregnant, resulting in the birth of Trevor. Steven argued to the court that Trevor was conceived during the time the parties had sexual intercourse, while Deborah argued conception had occurred through the last attempt at artificial insemination.

The trial court made a specific finding that Trevor had been conceived through artificial insemination, not sexual intercourse. Notwithstanding this finding, the trial court concluded public policy required that it not apply section 7613, subdivision (b). Instead the trial court recognized Steven as Trevor's natural father to be accorded all rights attendant thereto, concluding that Deborah was estopped from relying on section 7613, subdivision (b).

Pursuant to California Rules of Court, Special Rules for Trial Courts, rule 5.180, Deborah appealed from the interlocutory ruling of paternity. Given the

---

[1] All further statutory references will be to the Family Code, unless otherwise stated.

clear language of section 7613, subdivision (b), and the finding by the trial court that insemination occurred artificially, we conclude the court erred. We reverse the judgment and order judgment entered in favor of Deborah D.

## DISCUSSION

Section 7613 is part of the Uniform Parentage Act (UPA), as it was adopted in California, which " 'provides a comprehensive scheme for judicial determination of paternity, and was intended to rationalize procedure, to eliminate constitutional infirmities in then existing state law, and to improve state systems of support enforcement.' [Citations.]" (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1050 [43 Cal.Rptr.2d 445, 898 P.2d 891].) Under the UPA, only a "natural father" or an adoptive father may have the rights, privileges, duties, and obligations incident to a parent-child relationship. (§ 7601.)

As previously noted, the trial court expressly found that Trevor had been conceived through the second attempt at artificial insemination with semen provided by Steven. The parties had stipulated during trial that Steven had provided the semen to a licensed physician for that purpose. The court made no finding with regard to the parties' marital status, but the undisputed evidence was that Steven was married to another at the time of donating his sperm and that Deborah was divorced, and there was no evidence that the parties were ever married to each other. Thus, each element of section 7613, subdivision (b), was satisfied.

Nevertheless, the trial court ruled that the statute did not preclude a finding of paternity, based on estoppel. Its statement of decision reflects the following reasoning:

"[Deborah] was artificially inseminated a second time on April 8, 1999. [Steven] accompanied [Deborah] to the insemination with [Steven's] sperm and held her hand during the procedure. [Deborah] learned that she was pregnant as a result of that insemination with Trevor shortly thereafter. [Steven] attended Trevor's first ultra-sound with [Deborah], and witnessed Trevor's heartbeat for the first time with [Deborah]. [Steven] attended a joint therapy session with [Deborah] to discuss issues relating to their child.

"It was stipulated that [Deborah] became pregnant with [Steven's] sperm in April 1999, and that the pregnancy resulted in the birth of the child who is the subject of these proceedings. Trevor . . . was born in [January, 2000] at St. John's Hospital in Santa Monica, California.

"[Deborah] called [Steven] on [the day Trevor was born], and exclaimed 'Congratulations! You're a father!' [Steven], who was on location for his employment, yelled out to his co-workers that he had a son. [Steven] came to the hospital the very day that [he] learned Trevor was born.

"Trevor's middle name is [Steven's] last name, and [Steven] and [Deborah] discussed that the child would have [Steven's] last name as part of the child's name prior to the child's birth. In fact, Trevor refers to [Steven] as 'Daddy Steve' and [Deborah] has referred to [Steven] as Trevor's father. After Trevor's birth, [Deborah] invited [Steven] to participate in an infant CPR class at [Deborah's] home.

"Family Code section 7613(b) does not preclude a finding of paternity because the doctrine of estoppel prevents [Deborah] from denying [Steven] his rights as a biological father. [Deborah's] conduct clearly reflects that [she] intended [Steven] to be Trevor's father and to be a part of Trevor's life. It is also clear that [Steven] relied on [Deborah's] conduct to form his expectation of ongoing contact and visitation. [Steven] also relied on [Deborah's] conduct in agreeing to father Trevor—often traveling thousands of miles to attempt conception with [Deborah], and be part of Trevor's life.

"Other than [Steven], there is no presumed or biological father. [Steven] is the genetic father; to find that [Steven] is not the father would deny to the child the emotional and financial support a second parent can provide. In the case at hand, where the parties actively tried to conceive a child over a period of months, it is inappropriate not to conclude that [Steven] is Trevor's father.

"Furthermore, it is the policy of California to favor a finding of paternity and require a father to assume his support obligations.

"Weighing the aforementioned factors, which include but are not limited to the facts described above, and determining the child's best interests, it is evident that [Deborah] is estopped from denying [Steven's] paternity. Any other result would be contrary to the public policy of this state."

Deborah contends that the relevant public policy is clearly set forth in section 7613, subdivision (b). We agree.

■ It is apparent that the trial court placed great reliance on the fact that Deborah knew Steven was the donor of the sperm; after the initial impregnation failed, the parties engaged in sexual intercourse in an attempt to impregnate Deborah; that Deborah acknowledged Steven as the father of Trevor; and that she allowed Steven to celebrate in the joy of Trevor's birth.

But there is nothing in section 7613, subdivision (b), which precludes its application given these facts.

■ The Legislature has expressly declared that "[t]here is a compelling state interest in establishing paternity for all children." (§ 7570.) The public policy with regard to the rights of sperm donors has also been established by the Legislature. (*Jhordan C. v. Mary K.* (1986) 179 Cal.App.3d 386, 397–398 [224 Cal.Rptr. 530].) "Our Legislature has already spoken and has afforded to unmarried women a statutory right to bear children by artificial insemination (as well as a right of men to donate semen) without fear of a paternity claim, through provision of the semen to a licensed physician." (*Id.* at pp. 397–398.) The Legislature "has likewise provided men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support. Subdivision (b) states only one limitation on its application: the semen must be 'provided to a licensed physician.' " (*Id.* at p. 392.)

■ Steven contends that we should look beyond the words of the statute to find legislative intent for a public policy favoring a finding of paternity where, as here, the mother was in an intimate relationship with a known donor and also attempted to conceive naturally, albeit unsuccessfully. Steven cites no evidence of such a legislative intent, but suggests that we look to our own perception of public policy, considering the best interests of the child, as he claims the appellate court did in *Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050 [95 Cal.Rptr.2d 864] (*Johnson*). But that is not our role, given the clear language of section 7613, subdivision (b). Nor did the court in *Johnson* usurp the role of the Legislature.

There, the court was called upon to determine whether a child born of artificial insemination was entitled to medical information about the donor, despite Cryobank's nondisclosure contract with the donor. In concluding the agreement regarding confidentiality was against public policy, the court was able to discern legislative intent from reference to the language of subdivision (a) of section 7613.[2] (See *Johnson, supra,* 80 Cal.App.4th at pp. 1066–1067.) In doing so, the court relied upon the words of the statute, not upon the justices' own perception of public policy. (*Ibid.*)

---

[2] The court construed the following language: " 'All papers and records pertaining to the insemination,' " whether part of the permanent record of a court or of a file held by the supervising physician and surgeon or elsewhere, are subject to inspection only " 'upon an order of the court for good cause' " shown. (*Johnson, supra,* 80 Cal.App.4th at p. 1066.)

■ It is for the Legislature, not the courts, to choose between conflicting public policies. (*Werner v. Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 129 [216 P.2d 825].) "The judiciary, in reviewing statutes enacted by the Legislature, may not undertake to evaluate the wisdom of the policies embodied in such legislation; absent a constitutional prohibition, the choice among competing policy considerations in enacting laws is a legislative function. [Citation.]" (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 53 [51 Cal.Rptr.2d 837, 913 P.2d 1046].)

■ The fundamental objective of statutory interpretation is to ascertain and effectuate the intent of the lawmakers. (*Kimmel v. Goland* (1990) 51 Cal.3d 202, 208 [271 Cal.Rptr. 191, 793 P.2d 524].) We begin (as did the *Johnson* court) with the words of the enactment, giving effect to its "plain meaning," before resorting to extrinsic aids. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; see *Johnson, supra,* 80 Cal.App.4th at pp. 1066–1067.) "Where . . . legislative intent is expressed in unambiguous terms, we must treat the statutory language as conclusive; 'no resort to extrinsic aids is necessary or proper.' [Citations.]" (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1119–1120 [81 Cal.Rptr.2d 471, 969 P.2d 564].)

■ The words of section 7613, subdivision (b) are clear. (See *Robert B. v. Susan B.* (2003) 109 Cal.App.4th 1109, 1113 [135 Cal.Rptr.2d 785].) There can be no paternity claim from a sperm donor who is not married to the woman who becomes pregnant with the donated semen, so long as it was provided to a licensed physician. (Fam. Code, § 7613, subd. (b).) The statute does not make an exception for *known* sperm donors, who will be denied a paternity claim so long as the semen was provided to a licensed physician for insemination of an unmarried woman. (See *Jhordan C. v. Mary K., supra,* 179 Cal.App.3d at pp. 394, 396 [close relationship considered, however, where sperm was not provided through a physician].) "[A] woman who . . . wishes to choose her donor can still obtain statutory protection from a donor's paternity claim through the relatively simple expedient of obtaining the semen . . . from a chosen donor . . . through a licensed physician." (*Id.* at p. 394.)

And there is no indication that the Legislature intended to establish a public policy against donating sperm for use by a woman who is not the donor's wife, even where there is an intimate relationship. (Cf., *Hecht v. Superior Court* (1993) 16 Cal.App.4th 836, 853–854 [20 Cal.Rptr.2d 275] [testamentary gift of frozen sperm to decedent's girlfriend upheld].)

■　Steven contends that the Legislature could not have anticipated that a sperm donor might be the intimate friend and sexual partner of the mother, and he urges us to "fill in the blanks" left by the Legislature. Our authority, however, "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted." (Code Civ. Proc., § 1858.)

■　The courts are often called upon to construe statutes in factual settings not contemplated by the Legislature, and in doing so, may not disregard the statute and decide the case according to other criteria, such as the court's own "sense of the demands of public policy." (*Johnson v. Calvert* (1993) 5 Cal.4th 84, 89 [19 Cal.Rptr.2d 494, 851 P.2d 776].) In any event, it is doubtful that the Legislature did not anticipate a close relationship between donor and mother. The first reported artificial insemination took place in 1799, and artificial insemination by donor was practiced widely by the 1930's and 1940's. (See Hill, *What Does It Mean to Be a "Parent"? The Claims of Biology As the Basis for Parental Rights* (1991) 66 N.Y.U. L.Rev. 353.)

■　Further, it is presumed that the Legislature knows how to create an exception to the provisions of a statute, and that where it does not create an exception, it is presumed that it did not intend to do so. (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].) If the Legislature deemed it appropriate to exempt men who donate sperm through a licensed physician for use by their unmarried sexual partners, it would have done so.

Deborah also contends that the court's finding of estoppel is unsupported by substantial evidence, and that there can be no estoppel as a matter of law in a case such as this. As Deborah points out, "courts have refused to recognize or expand the doctrines of 'de facto parenthood,' equitable estoppel, in loco parentis, guardianship, or the contractual right to parenthood, to grant custody rights to a nonparent who was otherwise excluded by law from paternity rights. [Citation.]" (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 192 [98 Cal.Rptr.2d 44]; see also *In re Marriage of Lewis & Goetz* (1988) 203 Cal.App.3d 514, 519–520 [250 Cal.Rptr. 30].)

But we need not address these arguments. The trial court acted sua sponte in relying on estoppel to reach the result it apparently desired. Estoppel was not an issue presented or relied upon by either party at trial. Steven's claim was based entirely upon his contentions that public policy favored paternity in known donor cases, that conception was accomplished by sexual intercourse, and that Deborah would be unable to prove that it was the result of artificial insemination.

## DISPOSITION

The judgment is reversed and the matter is remanded with directions to enter judgment in favor of Deborah. Deborah shall have costs on appeal.

Epstein, P. J., and Curry, J., concurred.