*134 Opinion
MORENO, J.
We granted review in this case, as well as in Elisa B. v. Superior Court (2005) 37 Cal.4th 108 [33 Cal.Rptr.3d 46, 117 P.3d 660], and Kristine H. v. Lisa R. (2005) 37 Cal.4th 156 [33 Cal.Rptr.3d 81, 117 P.3d 690], to consider the parental rights and obligations, if any, of a woman with regard to a child bom to her partner in a lesbian relationship.
In the present case, we must decide whether a woman who provided ova to her lesbian partner so that the partner could bear children by means of in vitro fertilization is a parent of those children. For the reasons that follow, we conclude that Family Code section 7613, subdivision (b), which provides that a man is not a father if he provides semen to a physician to inseminate a woman who is not his wife, does not apply when a woman provides her ova to impregnate her partner in a lesbian relationship in order to produce children who will be raised in their joint home. Accordingly, when partners in a lesbian relationship decide to produce children in this manner, both the woman who provides her ova and her partner who bears the children are the children’s parents.
Facts
On March 6, 2001, petitioner KM.[1] filed a petition to establish a parental relationship with twin five-year-old girls bom to respondent E.G., her former lesbian partner. KM. alleged that she “is the biological parent of the minor children” because “[s]he donated her egg to respondent, the gestational mother of the children.” E.G. moved to dismiss the petition on the grounds that, although KM. and E.G. “were lesbian partners who lived together until this action was filed,” KM. “explicitly donated her ovum under a clear written agreement by which she relinquished any claim to offspring bom of her donation.”
On April 18, 2001, K.M. filed a motion for custody of and visitation with the twins.
A hearing was held at which E.G. testified that she first considered raising a child before she met K.M., at a time when she did not have a partner. She met K.M. in October 1992 and they became romantically involved in June 1993. E.G. told KM. that she planned to adopt a baby as a single mother. E.G. applied for adoption in November 1993. KM. and E.G. began living together in March 1994 and registered as domestic partners in San Francisco.
E.G. visited several fertility clinics in March 1993 to inquire about artificial insemination and she attempted artificial insemination, without *135 success, on 13 occasions from July 1993 through November 1994. K.M. accompanied her to most of these appointments. K.M. testified that she and E.G. planned to raise the child together, while E.G. insisted that, although K.M. was very supportive, E.G. made it clear that her intention was to become “a single parent.”
In December 1994, E.G. consulted with Dr. Mary Martin at the fertility practice of the University of California at San Francisco Medical Center (UCSF). E.G.’s first attempts at in vitro fertilization failed because she was unable to produce sufficient ova. In January 1995, Dr. Martin suggested using K.M.’s ova. E.G. then asked K.M. to donate her ova, explaining that she would accept the ova only if K.M. “would really be a donor” and E.G. would “be the mother of any child,” adding that she would not even consider permitting K.M. to adopt the child “for at least five years until [she] felt the relationship was stable and would endure.” E.G. told K.M. that she “had seen too many lesbian relationships end quickly, and [she] did not want to be in a custody battle.” E.G. and K.M. agreed they would not tell anyone that K.M. was the ova donor.
K.M. acknowledged that she agreed not to disclose to anyone that she was the ova donor, but insisted that she only agreed to provide her ova because she and E.G. had agreed to raise the child together. K.M. and E.G. selected the sperm donor together. K.M. denied that E.G. had said she wanted to be a single parent and insisted that she would not have donated her ova had she known E.G. intended to be the sole parent.
On March 8, 1995, K.M. signed a four-page form on UCSF letterhead entitled “Consent Form for Ovum Donor (Known).” The form states that K.M. agrees “to have eggs taken from my ovaries, in order that they may be donated to another woman.” After explaining the medical procedures involved, the form states on the third page: “It is understood that I waive any right and relinquish any claim to the donated eggs or any pregnancy or offspring that might result from them. I agree that the recipient may regard the donated eggs and any offspring resulting therefrom as her own children.” The following appears on page 4 of the form, above K.M.’s signature and the signature of a witness: “I specifically disclaim and waive any right in or any child that may be conceived as a result of the use of any ovum or egg of mine, and I agree not to attempt to discover the identity of the recipient thereof.” E.G. signed a form entitled “Consent Form for Ovum Recipient” that stated, in part: “I acknowledge that the child or children produced by the FVF procedure is and shall be my own legitimate child or children and the heir or heirs of my body with all rights and privileges accompanying such status.”
E.G. testified she received these two forms in a letter from UCSF dated February 2, 1995, and discussed the consent forms with K.M. during *136 February and March. E.G. stated she would not have accepted K.M.’s ova if K.M. had not signed the consent form, because E.G. wanted to have a child on her own and believed the consent form “protected” her in this regard.
K.M. testified to the contrary that she first saw the ovum donation consent form 10 minutes before she signed it on March 8, 1995. K.M. admitted reading the form, but thought parts of the form were “odd” and did not pertain to her, such as the part stating that the donor promised not to discover the identity of the recipient. She did not intend to relinquish her rights and only signed the form so that “we could have children.” Despite having signed the form, K.M. “thought [she] was going to be a parent.”
Ova were withdrawn from K.M. on April 11, 1995, and embryos were implanted in E.G. on April 13, 1995. K.M. and E.G. told KM.’s father about the resulting pregnancy by announcing that he was going to be a grandfather. The twins were bom on December 7, 1995. The twins’ birth certificates listed E.G. as their mother and did not reflect a father’s name. As they had agreed, neither E.G. nor K.M. told anyone K.M. had donated the ova, including their friends, family and the twins’ pediatrician. Soon after the twins were bom, E.G. asked K.M. to marry her, and on Christmas Day, the couple exchanged rings.
Within a month of their birth, E.G. added the twins to her health insurance policy, named them as her beneficiary for all employment benefits, and increased her life insurance with the twins as the beneficiary. K.M. did not do the same.
E.G. referred to her mother, as well as K.M.’s parents, as the twins’ grandparents and referred to K.M.’s sister and brother as the twins’ aunt and uncle, and K.M.’s nieces as their cousins. Two school forms listed both K.M. and respondent as the twins’ parents. The children’s nanny testified that both K.M. and E.G. “were the babies’ mother.”
The relationship between K.M. and E.G. ended in March 2001 and K.M. filed the present action. In September 2001, E.G. and the twins moved to Massachusetts to live with E.G.’s mother.
The superior court granted E.G.’s motion to dismiss finding, in a statement of decision, “that [K.M.] . . . knowingly, voluntarily and intelligently executed the ovum donor form, thereby acknowledging her understanding that, by the donation of her ova, she was relinquishing and waiving all rights to claim legal parentage of any children who might result from the in vitro fertilization and implantation of her ova in a recipient (in this case, a known recipient, her domestic partner [E.G.]). . . . [K.M.]’s testimony on the subject of her execution of the ovum donor form was contradictory and not always credible.
*137 “[K.M.] and [E.G.] agreed prior to the conception of the children that [E.G.] would be the sole parent unless the children were later adopted, and [E.G.] told [K.M.] prior to her ovum donation that she ([E.G.]) would not consider an adoption by [K.M.] until some years later. [E.G.] and [K.M.] agreed in advance of the ovum donation that they would not tell others of [K.M.]’s genetic connection to the children (they also agreed that if and when it became appropriate they would consider how to inform the children); and they abided by this agreement until late 1999.
“. . . By voluntarily signing the ovum donation form, [K.M.] was donating genetic material. Her position was analogous to that of a sperm donor, who is treated as a legal stranger to a child if he donates sperm through a licensed physician and surgeon under Family Code section 7613[, subdivision] (b). The Court finds no reason to treat ovum donors as having greater claims to parentage than sperm donors. . . .
“The Court accepts the proposition that a child may have two legal mothers and assumed it to be the law in its analysis of the evidence herein. m... m
“[K.M.]’s claim to ‘presumed’ parenthood rests upon her contention that she has met the criteria of Family Code section 7611[, subdivision] (d). . . . [K.M.] . . . has failed to establish either that she received the twins into her home or that she held them out ‘as [her] natural child[ren.]’ Although [K.M.] treated the twins in all regards as though they were her own (and there can be no question but that they are fully bonded to her as such), the children were received into the parties’ home as [E.G.]’s children and, up until late 1999, both parties scrupulously held confidential [petitioner]’s ‘natural,’ i.e., in this case, her genetic relationship to the children.
“[E.G.] is not estopped by her conduct .... The Court finds that [petitioner] was not misled by any such conduct; that she knew that [respondent] did not intend thereby to confer parental rights upon her . . . .”
The Court of Appeal affirmed the judgment, ruling that K.M. did not qualify as a parent “because substantial evidence supports the trial court’s factual finding that only E.G. intended to bring about the birth of a child whom she intended to raise as her own.” The court observed that “the status of K.M. ... is consistent with the status of a sperm donor under the [Uniform Parentage Act], i.e., ‘treated in law as if he were not the natural father of a child thereby conceived.’ [Citation.]” Having concluded that the parties intended at the time of conception that only E.G. would be the child’s mother, the court concluded that the parties’ actions following the birth did not alter this agreement. The Court of Appeal concluded that if the parties *138 had changed their intentions and wanted K.M. to be a parent, their only option was adoption.
We granted review.
Discussion
K.M. asserts that she is a parent of the twins because she supplied the ova that were fertilized in vitro and implanted in her lesbian partner, resulting in the birth of the twins. As we will explain, we agree that K.M. is a parent of the twins because she supplied the ova that produced the children, and Family Code section 7613, subdivision (b)[2] (hereafter section 7613(b)), which provides that a man is not a father if he provides semen to a physician to inseminate a woman who is not his wife, does not apply because K.M. supplied her ova to impregnate her lesbian partner in order to produce children who would be raised in their joint home.[3]
The determination of parentage is governed by the Uniform Parentage Act (UPA). (§ 7600 et seq.) As we observe in the companion case of Elisa B. v. Superior Court, supra, 37 Cal.4th 108, 116, the UPA defines the “ ‘parent and child relationships which] extends equally to every child and to every parent, regardless of the marital status of the parents.’ (§ 7602.)”
In Johnson v. Calvert (1993) 5 Cal.4th 84, 87 [19 Cal.Rptr.2d 494, 851 P.2d 776], we determined that a wife whose ovum was fertilized in vitro by her husband’s sperm and implanted in a surrogate mother was the “natural mother” of the child thus produced. We noted that the UPA states that provisions applicable to determining a father and child relationship shall be used to determine a mother and child relationship “insofar as practicable.” (Johnson v. Calvert, supra, at p. 90, citing former Civ. Code, § 7015, now Fam. Code, § 7650.) We relied, therefore, on the provisions in the UPA regarding presumptions of paternity and concluded that “genetic consanguinity” could be the basis for a finding of maternity just as it is for paternity. (Johnson v. Calvert, supra, 5 Cal.4th at p. 92; In re Marriage of Buzzanca (1998) 61 Cal.App.4th 1410, 1415 [72 Cal.Rptr.2d 280].) Under this authority, K.M.’s genetic relationship to the children in the present case constitutes “evidence of a mother and child relationship as contemplated by the Act. [Citations.]” (Johnson, supra, at p. 92.)
*139 The Court of Appeal in the present case concluded, however, that K.M. was not a parent of the twins, despite her genetic relationship to them, because she had the same status as a sperm donor. Section 7613(b) states: “The donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor’s wife is treated in law as if he were not the natural father of a child thereby conceived.” In Johnson, we considered the predecessor statute to section 7613(b), former Civil Code section 7005. (Johnson v. Calvert, supra, 5 Cal.4th 84, 100, fn. 14.) We did not discuss whether this statute applied to a woman who provides ova used to impregnate another woman, but we observed that “in a true ‘egg donation’ situation, where a woman gestates and gives birth to a child formed from the egg of another woman with the intent to raise the child as her own, the birth mother is the natural mother under California law.” (Id. at p. 93, fn. 10.) We held that the statute did not apply under the circumstances in Johnson, because the husband and wife in Johnson did not intend to “donate” their sperm and ova to the surrogate mother, but rather “intended to procreate a child genetically related to them by the only available means.” (Johnson, supra, at p. 100.)
The circumstances of the present case are not identical to those in Johnson, but they are similar in a crucial respect; both the couple in Johnson and the couple in the present case intended to produce a child that would be raised in their own home. In Johnson, it was clear that the married couple did not intend to “donate” their semen and ova to the surrogate mother, but rather permitted their semen and ova to be used to impregnate the surrogate mother in order to produce a child to be raised by them. In the present case, K.M. contends that she did not intend to donate her ova, but rather provided her ova so that E.G. could give birth to a child to be raised jointly by K.M. and E.G. E.G. hotly contests this, asserting that K.M. donated her ova to E.G., agreeing that E.G. would be the sole parent. It is undisputed, however, that the couple lived together and that they both intended to bring the child into their joint home. Thus, even accepting as true E.G.’s version of the facts (which the superior court did), the present case, like Johnson, does not present a “true ‘egg donation’ ” situation. (Johnson v. Calvert, supra, 5 Cal.4th 84, 93, fn. 10.) K.M. did not intend to simply donate her ova to E.G., but rather provided her ova to her lesbian partner with whom she was living so that E.G. could give birth to a child that would be raised in their joint home. Even if we assume that the provisions of section 7613(b) apply to women who donate ova, the statute does not apply under the circumstances of the present case. An examination of the history of 7613(b) supports our conclusion.
The predecessor to section 7613(b), former Civil Code section 7005, was enacted in 1975 as part of the UPA. (Stats. 1975, ch. 1244, § 11, pp. 3197-3198.) Section 5, subdivision (b), of the Model UPA states: “The *140 donor of semen provided to a licensed physician for use in artificial insemination of a married woman other than the donor’s wife is treated in law as if he were not the natural father of a child thereby conceived.” The comment to this portion of the model act notes that this provision was not intended to solve all questions posed by the use of artificial insemination: “This Act does not deal with many complex and serious legal problems raised by the practice of artificial insemination. It was though[t] useful, however, to single out and cover in this Act at least one fact situation that occurs frequently.” (9B West’s U. Laws Ann. (1987) U. Parentage Act, com. to § 5, pp. 301-302.)
Although the predecessor to section 7613 was based upon the Model UPA, the California Legislature made one significant change; it expanded the reach of the provision to apply to both married and unmarried women. “Section 7005 is derived almost verbatim from the UPA as originally drafted, with one crucial exception. The original UPA restricts application of the nonpaternity provision of subdivision (b) to a ‘married woman other than the donor’s wife.’ [Citation.] The word ‘married’ is excluded from subdivision (b) of section 7005, so that in California, subdivision (b) applies to all women, married or not. [f] Thus, the California Legislature has afforded unmarried as well as married women a statutory vehicle for obtaining semen for artificial insemination without fear that the donor may claim paternity, and has likewise provided men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support.” (Jhordan C. v. Mary K. (1986) 179 Cal.App.3d 386, 392 [224 Cal.Rptr. 530], fn. omitted.)
Under the Model UPA, a man who donated semen that was used to impregnate a woman who was married to someone other than the donor would not be considered the father of the resulting child. But the provision would not apply, and the semen donor would be considered the father of the child, if the woman impregnated was unmarried. Therefore, this provision of the model act would not apply if a man provided semen that was used to impregnate his unmarried partner in order to produce a child that would be raised in their joint home, and the man would be considered the father of the resulting child.
In adopting the model act, California expanded the reach of this provision by omitting the word “married,” so that unmarried women could avail themselves of artificial insemination. This omission was purposeful. As originally introduced in 1975, Senate Bill No. 347 (1975-1976 Reg. Sess.) proposed adopting verbatim the language of the model UPA and, thus, would have limited the reach of former Civil Code section 7005 to “married women.” (Sen. Bill No. 347 (1975-1976 Reg. Sess.) § 11, as introduced Feb. *141 4, 1975.) On May 8, 1975, however, the bill was amended in the Senate to delete the word “married.”[4]
It is clear, therefore, that California intended to expand the protection of the model act to include unmarried women so that unmarried women could avail themselves of artificial insemination. But there is nothing to indicate that California intended to expand the reach of this provision so far that it would apply if a man provided semen to be used to impregnate his unmarried partner in order to produce a child that would be raised in their joint home. It would be surprising, to say the least, to conclude that the Legislature intended such a result. The Colorado Supreme Court considered a related issue and reached a similar conclusion.
In In Interest of R.C. (Colo. 1989) 775 P.2d 27, 29, the Colorado Supreme Court addressed a Colorado statute identical to section 7613(b), which applied to both married and unmarried women. At issue were the parental rights, if any, of a man who provided semen to a physician that was used to impregnate an unmarried friend of the man. The man claimed that the woman had promised that he would be treated as the child’s father. The court recognized that the Model UPA addressed only the artificial insemination of a woman married to someone other than the semen donor, adding that the parental rights of a semen donor are “least clearly understood when the semen donor is known and the recipient is unmarried.” (R. C., supra, 775 P.2d at pp. 31, 33-34.) The court concluded that the statute did not apply when a man donated semen to an unmarried woman with the understanding that he would be the father of the resulting child: “[W]e conclude that the General Assembly neither considered nor intended to affect the rights of known donors who gave their semen to unmarried women for use in artificial insemination with the agreement that the donor would be the father of any child so conceived. [The statute] simply does not apply in that circumstance.” (Id. at p. 35.)
The Colorado Supreme Court was thus faced with a situation in which a man provided semen, through a physician, to an unmarried “friend” who allegedly had promised that the man would be the father of the resulting child. The court concluded that the Model UPA, and the Colorado statute based upon it, were not intended to apply to such circumstances. We are faced with an even more compelling situation, because K.M. and E.G. were more than “friends” when K.M. provided her ova, through a physician, to be used to impregnate E.G.; they lived together and were registered domestic partners. Although the parties dispute whether both women were intended to *142 be parents of the resulting child, it is undisputed that they intended that the resulting child would be raised in their joint home. Neither the Model UPA, nor section 7613(b) was intended to apply under such circumstances.[5]
As noted above, K.M.’s genetic relationship with the twins constitutes evidence of a mother and child relationship under the UPA (Johnson v. Calvert, supra, 5 Cal.4th 84, 92) and, as explained above, section 7613(b) does not apply to exclude K.M. as a parent of the twins. The circumstance that E.G. gave birth to the twins also constitutes evidence of a mother and child relationship. (Johnson v. Calvert, supra, 5 Cal.4th at p. 92.) Thus, both K.M. and E.G. are mothers of the twins under the UPA.[6]
It is true we said in Johnson that “for any child California law recognizes only one natural mother.” (Johnson v. Calvert, supra, 5 Cal.4th 84, 92.) But as we explain in the companion case of Elisa B. v. Superior Court, supra, 37 Cal.4th 108, this statement in Johnson must be understood in light of the issue presented in that case; “our decision in Johnson does not preclude a child from having two parents both of whom are women . . . .” (Id. at p. 119.)
Justice Werdegar’s dissent argues that we should determine whether K.M. is a parent using the “intent test” we developed in Johnson v. Calvert, supra, 5 Cal.4th 84. In Johnson, an embryo created using the sperm and egg of a married couple was implanted in a surrogate mother. It was undisputed that the husband was the father of the resulting child, but the wife and the surrogate both claimed to be the mother. We recognized that both women “have adduced evidence of a mother and child relationship” under the UPA—the wife because she is genetically related to the child and the surrogate because she gave birth to the child—but we rejected the suggestion that, under the circumstances of that case, the child could have two mothers, leaving the child with three parents. (5 Cal.4th at p. 92, fn. 8.) In order to determine which woman was the child’s sole mother under the UPA, we looked to their respective intents: “Because two women each have presented acceptable proof of maternity, we do not believe this case can be decided without enquiring into the parties’ intentions . . . .” (5 Cal.4th at p. 93.)
*143 As the dissent acknowledges, a child can have two mothers. Thus, this case differs from Johnson in that both K.M. and E.G. can be the children’s mothers. Unlike in Johnson, their parental claims are not mutually exclusive. K.M. acknowledges that E.G. is the twins’ mother. K.M. does not claim to be the twins’ mother instead of E.G., but in addition to E.G., so we need not consider their intent in order to decide between them. (In re Marriage of Moschetta (1994) 25 Cal.App.4th 1218, 1224 [30 Cal.Rptr.2d 893] [Johnson intent test does not apply when “[t]here is no ‘tie’ to break”].) Rather, the parentage of the twins is determined by application of the UPA. E.G. is the twins’ mother because she gave birth to them and K.M. also is the twins’ mother because she provided the ova from which they were produced.
Justice Werdegar’s dissent claims that we are “changing the law” by creating a “new rule” for determining whether a woman who supplies an ovum is the mother of the resulting child. (Dis. opn. of Werdegar, J., post, at p. 150.) We are not. Nothing in Johnson suggests that the intent test applies in cases not involving surrogacy agreements, and the dissent agrees that the linchpin of the decision in Johnson—that a child cannot have two mothers— does not apply here. (Id. at p. 148.) We simply hold that section 7613(b), which creates an exception to the usual rules governing parentage that applies when a man donates semen to inseminate a woman who is not his wife, does not apply under the circumstances of this case in which K.M. supplied ova to impregnate her lesbian partner in order to produce children who would be raised in their joint home. Because the exception provided in section 7613(b) does not apply, K.M.’s parentage is determined by the usual provisions of the UPA. As noted above, under the UPA, K.M.’s genetic relationship to the twins constitutes “evidence of a mother and child relationship.” (Johnson v. Calvert, supra, 5 Cal.4th 84, 92.)
It would be unwise to expand application of the Johnson intent test as suggested by Justice Werdegar’s dissent beyond the circumstances presented in Johnson. Usually, whether there is evidence of a parent and child relationship under the UPA does not depend upon the intent of the parent. For example, a man who engages in sexual intercourse with a woman who assures him, falsely, that she is incapable of conceiving children is the father of a resulting child, despite his lack of intent to become a father.
Justice Werdegar’s dissent states that predictability in this area is important, but relying upon a later judicial determination of the intent of the parties, as the dissent suggests, would not provide such predictability. The present case is a good example. Justice Werdegar’s dissent concludes that K.M. did not intend to become a parent, because the superior court “found on the basis of conflicting evidence that she did not,” noting that “[w]e must defer to the trial court’s findings on this point because substantial evidence *144 supports them.” (Dis. opn. of Werdegar, J., post, at pp. 149-150.) Had the superior court reached the opposite conclusion, however, the dissent presumably again would defer to the trial court’s findings and reach the opposite conclusion that K.M. is a parent of the twins. Rather than provide predictability, therefore, using the intent test would rest the determination of parentage upon a later judicial determination of intent made years after the birth of the child.
Justice Werdegar’s dissent cites Troxel v. Granville (2000) 530 U.S. 57, 65 [147 L.Ed.2d 49, 120 S.Ct. 2054] for the proposition that “We cannot recognize K.M. as a parent without diminishing E.G.’s existing parental rights.” (Dis. opn. of Werdegar, J., post, at p. 153.) The high court’s decision in Troxel has no application here. Neither K.M.’s nor E.G.’s claim to parentage preceded the other’s. K.M.’s claim to be the twins’ mother because the twins were produced from her ova is equal to, and arose at the same time as, E.G.’s claim to be the twins’ mother because she gave birth to them.
The superior court in the present case found that K.M. signed a waiver form, thereby “relinquishing and waiving all rights to claim legal parentage of any children who might result.” But such a waiver does not affect our determination of parentage. Section 7632 provides: “Regardless of its terms, an agreement between an alleged or presumed father and the mother or child does not bar an action under this chapter.” (See In re Marriage of Buzzanca, supra, 61 Cal.App.4th 1410, 1426 [“It is well established that parents cannot, by agreement, limit or abrogate a child’s right to support.” (Fn. omitted.)].) A woman who supplies ova to be used to impregnate her lesbian partner, with the understanding that the resulting child will be raised in their joint home, cannot waive her responsibility to support that child. Nor can such a purported waiver effectively cause that woman to relinquish her parental rights.
In light of our conclusion that section 7613(b) does not apply and that K.M. is the twins’ parent (together with E.G.), based upon K.M.’s genetic relationship to the twins, we need not, and do not, consider whether K.M. is presumed to be a parent of the twins under section 7611, subdivision (d), which provides that a man is presumed to be a child’s father if “[h]e receives the child into his home and openly holds out the child as his natural child.”
Disposition
The judgment of the Court of Appeal is reversed.
George, C. J., Baxter, J., and Chin, J., concurred.

 In order to protect the confidentiality of the minors, we will refer to the parties by their initials.

 Further undesignated statutory references are to the Family Code.

 Justice Werdegar’s dissent asserts that our decision “inappropriately confers rights and imposes disabilities on persons because of their sexual orientation.” (Dis. opn. of Werdegar, J., post, at p. 151.) We do not. We decide only the case before us, which involves a lesbian couple who registered as domestic partners. We express no view regarding the rights of others and, of course, our “opinion is not authority for a proposition not therein considered.” (Ginns v. Savage (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)

 The combined minutes of the May 3, 1975 and June 14, 1975 meetings of the Committee on Family Law, which are attached to the report of the Senate Committee on the Judiciary on Senate Bill No. 347 (1975-1976 Reg. Sess.), states that “[t]he committee recommended the deletion of ‘married’ ” in the original version of the bill.

 The Court of Appeal in Steven S. v. Deborah D. (2005) 127 Cal.App.4th 319, 326 [25 Cal.Rptr.3d 482], held that section 7613(b) applied where the semen donor was known to the impregnated woman and they had had a sexual relationship. But the semen donor in that case did not live with the impregnated woman, so the court did not address whether the statute would apply if the child was to be raised in the semen donor’s home.

 Contrary to the suggestion in Justice Werdegar’s dissent (dis. opn. of Werdegar, J., post, at pp. 152-153, 154), we do not consider whether it is in the twins’ best interest for the woman who supplied the ova from which they were produced, intending to raise the children in her home, to be declared their natural mother. We simply follow the dictates of the UPA.