Filed 5/14/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| JASON P., | B248629 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BF045218) |
| v. | |
| DANIELLE S., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Stephen M. Moloney and Mark A. Juhas, Judges. Reversed.

Fred Silberberg and Edward J. Horowitz for Plaintiff and Appellant.

Wasser, Cooperman & Carter, Laura A. Wasser; Glaser Weil Fink Jacobs Howard Avchen & Shapiro, Patricia L. Glaser and Fred D. Heather for Defendant and Respondent.

Family Code[1] section 7613, subdivision (b) (hereafter, section 7613(b)) currently provides: "The donor of semen provided to a licensed physician and surgeon or to a licensed sperm bank for use in assisted reproduction of a woman other than the donor's spouse is treated in law as if he were not the natural parent of a child thereby conceived, unless otherwise agreed to in a writing signed by the donor and the woman prior to the conception of the child."[2] In *Steven S. v. Deborah D.* (2005) 127 Cal.App.4th 319 (*Steven S.*), we reversed a finding of paternity in favor of a donor of semen provided to a licensed physician, rejecting the sperm donor's argument "that we should look beyond the words of the statute to find legislative intent for a public policy favoring a finding of paternity where, as here, the mother was in an intimate relationship with a known donor and also attempted to conceive naturally, albeit unsuccessfully." (*Id.* at p. 325.) In rejecting the donor's argument, we employed broad and categorical language. We declared: "There can be no paternity claim from a sperm donor who is not married to the woman who becomes pregnant with the donated semen, so long as it was provided to a licensed physician." (*Id.* at p. 326.)

We should not have been so categorical, because we were not faced with a donor seeking to establish paternity under section 7611, the presumed parentage statute, and therefore had no occasion to consider whether section 7613(b) precludes any such attempt. We do so now, and conclude that section 7613(b) does not preclude a donor from establishing that he is a presumed father under section 7611.

---

[1]    Further undesignated statutory references are to the Family Code.

[2]    We note that section 7613(b) was amended twice since the child at issue here was conceived and born, once in 2011 to add the last clause and the other in 2013 to make it gender neutral in places. We discuss the first amendment in section C., *post*.

2

# BACKGROUND

In June 2012, appellant Jason P. filed a petition to establish a parental relationship with Gus S., a child born to respondent Danielle S. in December 2009. Danielle opposed the petition, arguing that Jason was a sperm donor under section 7613(b) and therefore was not Gus's natural father as a matter of law. Jason contended that (1) he is not a sperm donor within the meaning of section 7613(b); (2) he is a presumed parent under section 7611, subdivision (d) (hereafter, section 7611(d)); (3) Danielle is estopped from denying Jason's parental relationship; and (4) it would be unconstitutional to deny Jason an opportunity to establish legal paternity under the facts of the case. The family law court set the matter for trial in phases, ordering that the first phase of the trial would address only whether Jason is a sperm donor within the meaning of section 7613(b). In the meantime, the court entered a pendente lite order awarding visitation for Jason with Gus.

The parties agreed upon the following facts at the start of the trial. Jason and Danielle cohabitated for many years, but they never married. Gus was conceived through in vitro fertilization (IVF). Jason provided to a licensed fertility clinic the sperm used in the IVF procedure. Jason is not listed on Gus's birth certificate, and there is no voluntary declaration of paternity. Gus has no other natural, presumed, or potential biological father.

In addition to the agreed upon facts, Jason presented evidence that he and Danielle tried to have a baby naturally beginning in 2006. Although Danielle became pregnant in December 2006, the pregnancy was not viable after six and a half weeks. In 2007, Danielle had two intrauterine insemination (IUI) procedures using Jason's sperm, but neither resulted in a pregnancy. In October 2007, after being advised that their inability to conceive might be due to issues regarding

3

Jason's sperm count, Jason had a surgical procedure to address that problem. She and Jason also began to look into having an IVF procedure.

In May 2008, Danielle moved out of Jason's home and bought a home nearby. The following month she purchased sperm of an anonymous donor from a sperm bank and told Jason she was going to pursue motherhood as a single mother. At some point in the fall of 2008, she looked at a website for "single mothers by choice" to learn about her rights; she learned that in California, a man who gives his sperm for artificial insemination is never treated in the law as though he is the father.[3] In September 2008, she moved back into Jason's house while the house she bought was being remodeled.

In November 2008 or January 2009,[4] Jason gave Danielle a letter in which he wrote that he was not ready to be a father, but if Danielle wanted to use his sperm to conceive, she had his blessing as long as she did not tell others.[5] Danielle chose to use Jason's sperm rather than the anonymous donor's sperm she had purchased.

After having an unsuccessful IUI procedure in January 2009 using Jason's sperm, Danielle decided to try an IVF procedure. Before the procedure, Danielle and Jason both signed a series of informed consent forms provided by California Fertility Partners. On each form, Danielle filled in both her name and Jason's

---

[3]   In a declaration filed in connection with her opposition to Jason's motion for pendente lite custody and visitation, Danielle stated that she did not learn about this statutory provision until July 26, 2012.

[4]   Danielle testified that Jason gave her the letter in January 2009, just before she had an appointment for an IUI procedure at the fertility clinic. Jason testified that he gave Danielle the letter the previous November.

[5]   Jason and Danielle offered different interpretations of the letter, but those differences are not relevant to the issues in this appeal.

4

name in the spaces designated for the "Intended Parent." On March 9, 2009, Jason took Danielle to California Fertility Partners for the IVF procedure. The procedure was successful, and Gus was born in December 2009.

At trial, Jason presented evidence regarding his relationship with Gus and Danielle over the next two and a half years. For example, he presented evidence that Danielle referred to Jason as "Dada" when speaking to Gus, and Gus called Jason "Dada." When Jason was working in New York for six months, Danielle and Gus flew there several times and stayed with Jason at his apartment. When Danielle and Gus were not in New York with Jason, Jason communicated with Gus over the Internet by Skype. Jason continued to maintain contact with Gus until the middle of 2012, when Danielle terminated her relationship with Jason.[6]

At the close of evidence in the first phase of the trial, Danielle moved for nonsuit under Code of Civil Procedure section 631.8. The court granted the motion. In announcing its ruling, the court stated, "I don't think anyone is going to prevail as a result of this. I think at the end of the day that everyone turns out to be worse off, and certainly I think Gus turns out to be worse off as a result of where we're going to end up. But it just is what it is, because I think that's the legislative policy that's been articulated." The court provided its oral statement of decision, and subsequently issued a written statement of decision.

Relying upon our decision in *Steven S.*, *supra*, 127 Cal.App.4th 319, the trial court rejected Jason's argument that section 7613(b) does not apply. The court found that the undisputed evidence that Jason's semen was provided to a licensed physician and surgeon, that Gus was conceived through IVF using Jason's sperm,

---

[6] Jason presented additional evidence of Danielle's and his post-birth conduct, over Danielle's objection, to support his argument that he and Danielle intended Jason to be Gus's natural father. We need not discuss that evidence in detail for purposes of this appeal.

and that he and Danielle were never married conclusively established that section 7613(b) applies. The court did not determine whether the 2011 amendment of section 7613(b) -- which provided an exception when the donor and the mother agree in writing before conception that the donor will be treated in law as the natural parent -- applies retroactively, because the court found there was no such writing.

The trial court also rejected Jason's estoppel arguments. First, the court found that, even if the estoppel doctrine could apply in the context of a section 7613(b) case, Jason could not establish equitable estoppel because there was no evidence that Danielle made representations to Jason that he would have the legal rights of a natural father or that he could co-parent, nor is there evidence of detrimental reliance by Jason. The court also found that the parentage by estoppel doctrine did not apply because that doctrine is used to establish paternity against a man who is not the child's biological father.

Next, the trial court found that Jason could not establish paternity under section 7611(d) because section 7613(b) is the exclusive means of determining paternity in cases involving sperm donors and unmarried women.

Finally, the trial court found that application of section 7613(b) to Jason is not unconstitutional. The court noted that "the Legislature has weighed competing public policies regarding paternity and sperm donors, and has reconciled those considerations by affording '"to unmarried women a statutory right to bear children by artificial insemination (as well as a right of men to donate semen) without fear of a paternity claim [and] likewise provided men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support."' [Citation.] This public policy determination is within the Legislature's authority, and does not make § 7613(b) unconstitutional."

6

Having found that Jason did not have a parent and child relationship with Gus, the trial court found Jason was not entitled to custody of, or visitation with, Gus, and vacated the pendente lite visitation order.  Judgment was entered in favor of Danielle, from which Jason appeals.

## DISCUSSION

On appeal, Jason contends that our decision in *Steven S.*, *supra*, 127 Cal.App.4th 319 does not govern the issues in this appeal, and that the trial court erred in finding that section 7613(b) bars him from establishing paternity under section 7611(d).  He also contends the trial court misconstrued the law and erred in finding that Danielle is not equitably estopped to rely on section 7613(b), and in finding that the informed consent documents Danielle and Jason signed before the IVF procedure did not satisfy the "agreed to in a writing" requirement for the exception in section 7613(b).  Finally, Jason contends the trial court's ruling that section 7613(b) barred Jason from establishing parentage under section 7611(d) or by equitable estoppel violated his constitutional parental rights.  Jason's first contention is well taken; the remainder are not.

A. *Section 7613(b) Does Not Necessarily Preclude a Finding of Parentage Under Section 7611*

The Uniform Parentage Act (UPA) (§ 7600 et seq.) governs the determination of parentage.  (*K.M. v. E.G.* (2005) 37 Cal.4th 130, 138.)  As we explained in *Steven S.*, the UPA, as adopted in California, """provides a comprehensive scheme for judicial determination of paternity, and was intended to rationalize procedure, to eliminate constitutional infirmities in then existing state law, and to improve state systems of support enforcement." [Citations.]'  Under the UPA, only a 'natural father' or an adoptive father may have the rights,

7

privileges, duties, and obligations incident to a parent-child relationship. (§ 7601.)" (*Steven S.*, *supra*, 127 Cal.App.4th at p. 323.)

In *Steven S.*, we were asked to interpret section 7613(b), a provision of the UPA, to determine whether a man who provided semen to a licensed physician for use in artificial insemination of a woman other than the donor's wife could be found to be the natural father of the resulting child when the man and the woman were in an intimate relationship and also tried to conceive naturally. (*Steven S.*, *supra*, 127 Cal.App.4th at p. 325.) At that time, section 7613(b) stated: "'The donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived.'" (*Id.* at p. 322.) We concluded that the language of the statute was clear and unambiguous, and did not include an exception. (*Id.* at p. 326.) We observed that "[i]f the Legislature deemed it appropriate to exempt men who donate sperm through a licensed physician for use by their unmarried sexual partners, it would have done so." (*Id.* at p. 327.)

Danielle argues that our statement in *Steven S.* – that "[t]here can be no paternity claim from a sperm donor who is not married to the woman who becomes pregnant with the donated semen, so long as it was provided to a licensed physician" (*Steven S.*, *supra*, 127 Cal.App.4th at p. 326) – controls this case and precludes Jason from establishing parentage under any theory. She is incorrect. The only issue we were asked to decide in *Steven S.* was whether section 7613(b) applied when the sperm donor is an intimate friend and sexual partner of the mother. We were not asked to decide whether section 7613(b) precluded a finding of parentage under section 7611 or any other theory. (See *id.* at p. 327 [declining to address whether Steven could be found to be a parent based on estoppel because "Steven's claim was based entirely upon his contentions that public policy favored

8

paternity in known donor cases, that conception was accomplished by sexual intercourse, and that [the mother] would be unable to prove that it was the result of artificial insemination"].) Therefore, *Steven S.* does not resolve the issues Jason raises in this case. (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127 [""""It is axiomatic that cases are not authority for propositions not considered""""].)

In any event, our categorical statement appears to have been undermined by an observation the California Supreme Court made in a case decided a few months after our decision in *Steven S.* In *K.M. v. E.G.*, *supra*, 37 Cal.4th 130, the Supreme Court examined section 7613(b) in the context of a lesbian couple, where one of the women, K.M., provided ova to her partner, E.G., for use in an IVF procedure. (*Id.* at p. 134.) After the relationship ended, K.M. filed an action to establish a parental relationship with the twin girls born to E.G. as a result of the IVF procedure. (*Id.* at p. 136.) The trial court granted E.G.'s motion to dismiss, finding, among other things, that K.M.'s position was analogous to that of a sperm donor under section 7613(b). (*Id.* at p. 137.)

The Supreme Court reversed, finding that the facts "[did] not present a 'true "egg donation"' situation" because the couple lived together and intended to bring the child into their joint home, and therefore section 7613(b), assuming it applied to women who donate ova, did not apply. (*K.M. v. E.G.*, *supra*, 37 Cal.4th at p. 139.) The Court explained that the history of section 7613(b) supported its conclusion. It observed that the comment to the portion of the Model UPA upon which section 7613(b) was based "notes that this provision was not intended to solve all questions posed by the use of artificial insemination." (*K.M. v. E.G.*, *supra*, 37 Cal.4th at p. 140.) The Court also noted that, while the Model UPA "'restricts application of the nonpaternity provision of [section 7613(b)] to a "*married* woman other than the donor's wife" . . . in California, [section 7613(b)]

9

applies to all women, married or not. [¶] Thus, the California Legislature has afforded unmarried as well as married women a statutory vehicle for obtaining semen for artificial insemination without fear that the donor may claim paternity and has likewise provided men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support.'" (*K.M. v. E.G.*, *supra*, 37 Cal.4th at p. 140.) The Court concluded: "It is clear, therefore, that California intended to expand the protection of the model act to include unmarried women so that unmarried women could avail themselves of artificial insemination. But there is nothing to indicate that California intended to expand the reach of this provision so far that it would apply if a man provided semen to be used to impregnate his unmarried partner in order to produce a child that would be raised in their joint home. It would be surprising, to say the least, to conclude that the Legislature intended such a result." (*Id.* at p. 141.)

The Supreme Court did not address the applicability of section 7611(d) in sperm or ova donation cases in *K.M. v. E.G.* because the trial court found that K.M. did not hold the children out as her natural children and therefore did not meet the statutory definition of a presumed mother. (*K.M. v. E.G.*, *supra*, 37 Cal.4th at p. 137; see also *id.* at p. 146 (dis. opn., Kennard, J.).) The trial court in the present case made no such finding, having ruled that section 7613(b) precludes Jason from establishing paternity under any theory. We conclude the trial court's ruling was incorrect. Instead, we hold that section 7613(b) should be interpreted only to preclude a sperm donor from establishing paternity based upon his biological connection to the child, and does not preclude him from establishing that he is a presumed parent under section 7611(d) based upon post-birth conduct.

We reach this conclusion because we must construe section 7613(b) "'""with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]"' [Citation.] . . . [W]e choose

10

the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.)

Section 7613(b) and section 7611 both are part of the UPA. Section 7611 provides that "[a] person is presumed to be the natural parent of a child if the person meets the conditions provided in Chapter 1[7] (commencing with Section 7540) or Chapter 3[8] (commencing with Section 7570) of Part 2," or if the person meets certain other conditions set forth in the subdivisions that follow. Those conditions are: (1) the presumed parent and the mother are or have been married, and the child is born during the marriage or within 300 days after the marriage was terminated (§ 7611, subd. (a)); (2) the presumed parent and the mother attempted to marry before the child's birth, but the marriage was declared invalid (§ 7611, subd. (b)); (3) the presumed parent and the mother married or attempted to marry after the child's birth, and the presumed parent (with his or her consent) is named on the child's birth certificate or the presumed parent is obligated to support the child under a written agreement or court order (§ 7611, subd. (c)); (4) the presumed parent receives the child into his or her home and openly holds out the child as his or her natural child (§ 7611, subd. (d)); or (5) the child was conceived

---

**7**     Chapter 1, commencing with section 7540, provides that the child of a woman cohabiting with her husband is conclusively presumed to be a child of the marriage (§ 7540), unless a blood test establishes that the husband is not the father of the child (§ 7541, subd. (a)). However, section 7541, subdivision (e) provides that blood tests may not be used to challenge paternity in a case coming within section 7613.

**8**     Chapter 3, commencing with section 7570, establishes a system for voluntary declarations of paternity. However, section 7612, subdivision (f)(3) provides that a voluntary declaration of paternity is invalid if "[t]he man signing the declaration is a sperm donor, consistent with subdivision (b) of Section 7613."

11

after the death of the presumed parent under the conditions set forth in Probate Code section 249.5 (§ 7611, subd. (f)).[9]

"'The paternity presumptions are driven by state interest in preserving the integrity of the family and legitimate concern for the welfare of the child. The state has an "'interest in preserving and protecting the developed parent-child . . . relationships which give young children social and emotional strength and stability.'"'" (*In re Nicholas H.* (2002) 28 Cal.4th 56, 65.) "This interest is served notwithstanding termination of the mother's marital relationship with the presumed father." (*Susan H. v. Jack S.* (1994) 30 Cal.App.4th 1435, 1443.)

"'The statutory purpose [of section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.'" (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) A biological connection to the child is not necessary for the presumption of paternity to arise. (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 125.) Nor is it necessary for the person seeking presumed parent status to have entered into the familial relationship from the time of conception or birth. "[T]he premise behind the category of presumed father is that an individual who has demonstrated a commitment to the child and the child's welfare -- regardless of whether he is biologically the father -- is entitled to the elevated status of presumed fatherhood." (*In re T.R.*, *supra*, 132 Cal.App.4th at pp. 1211-1212.) Thus, a sperm donor who has established a familial relationship with the child, and has demonstrated a commitment to the child and the child's welfare, can be found to be a presumed parent even though he could not establish paternity based upon his biological connection to the child.

---

[9] Subdivision (e) of section 7611 became inoperative on January 1, 1997.

By interpreting section 7613(b) only to preclude a sperm donor from establishing paternity based upon his biological connection to the child, while allowing him to establish that he is a presumed parent under section 7611 based upon a demonstrated familial relationship, we allow both statutes to retain effectiveness and promote the purpose of each. Moreover, we avoid a construction that would lead to unintended, and some might say absurd, consequences. For example, suppose an unmarried couple that had tried unsuccessfully to conceive a child naturally, finally were able to conceive through assisted reproduction. They then got married, after conception but before the birth of the child, and raised the child together. After several years, they divorced and the mother sought child support because she could not afford to care for the child on her own. Under Danielle's interpretation of section 7613(b), the mother's ex-husband would have no obligation to support the child because he was a sperm donor under section 7613(b) and could not be found to be the child's presumed father under section 7611, despite having been married to the mother at the time of the child's birth and having raised the child as his own. The Legislature could not have intended this result.

Our holding that a sperm donor is not precluded from establishing presumed parentage does not mean that a mother who conceives through assisted reproduction and allows the sperm donor to have some kind of relationship with the child necessarily loses her right to be the sole parent.

First, section 7611 requires a *familial* relationship. To qualify as a presumed parent under subdivision (d), the presumed parent must show that he or she "receives the child into his or her home and openly holds out the child as his or her natural child." (§ 7611, subd. (d).) A mother wishing to retain her *sole* right to parent her child conceived through assisted reproduction can limit the kind of

13

contact she allows the sperm donor to have with her child to ensure that the relationship does not rise to the level of presumed parent and child.[10]

Second, the presumption of parentage under section 7611 is, with certain exceptions, a *rebuttable* presumption. (§ 7612, subd. (a).) Thus, even if a sperm donor can establish that he received the child into his home and openly held out the child as his natural child, the trial court nevertheless may conclude based on other evidence that the presumption has been rebutted and the sperm donor is not the child's natural father. (*In re T.R.*, *supra*, 132 Cal.App.4th at p. 1212 ["The Legislature, in its wisdom, made the presumptions of fatherhood it created in section 7611 rebuttable presumptions, affording the court the discretion to rebut the presumption if it is fitting to do so"].)

In this case, Jason was denied the opportunity to present evidence to show that he is Gus's presumed father under section 7611(d). Therefore, the judgment must be reversed and the matter remanded for further proceedings.


B.     *Equitable Estoppel Does Not Apply*

In addition to arguing that the trial court erred in finding he was precluded from establishing parentage under section 7611(d), Jason also argues that the trial court erred in its analysis of his estoppel claim because the court focused only on the parties' conduct before conception. He contends the trial court erred because his estoppel argument is that Danielle should be estopped to rely on section 7613(b) based upon her conduct after Gus was conceived and born. But even if the trial court misconstrued Jason's argument, there was no reversible error because the doctrine of equitable estoppel does not apply here.

---

[10]     As counsel for Jason conceded at oral argument, a sperm donor does not have a right to demand an opportunity to establish a relationship with the child. He can only seek to *maintain* a relationship if he meets the conditions set forth in section 7611.

The California Supreme Court has instructed that "estoppel will not be recognized 'when to do so would nullify "a strong rule of policy adopted for the benefit of the public. . . ."'" [Citations.]" (*Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 564.) Section 7613(b) represents such a policy. It was enacted to allow both married and unmarried women an opportunity to conceive a child through donated sperm without fear that the donor will claim paternity by virtue of biology, and to allow men to donate sperm without fear of liability for child support based upon his biological connection to the child. This protection would be lost if we allowed a sperm donor who is unable to establish presumed parentage under section 7611(d) to assert that the mother is estopped to rely upon the protection afforded her under section 7613(b). Therefore, we conclude that, as a matter of law, Danielle is not estopped to rely upon section 7613(b) to argue that Jason cannot establish parentage based upon his biological connection to Gus.

C.     *The Informed Consent Documents Do Not Satisfy Section 7613(b)*

As we noted in footnote 2, *ante*, section 7613(b) was amended in 2011 to add an exception to its application. Before the amendment, and at the time Gus was conceived, the statute provided: "The donor of semen provided to a licensed physician and surgeon or to a licensed sperm bank for use in artificial insemination or in vitro fertilization of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." (Stats. 2008, ch. 534, § 2.) After the 2011 amendment, the statute provided: "The donor of semen provided to a licensed physician and surgeon or to a licensed sperm bank for use in artificial insemination or in vitro fertilization of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby

15

conceived, unless otherwise agreed to in a writing signed by the donor and the woman prior to the conception of the child." (Stats. 2011, ch. 185, § 4.)

Jason argues that the amendment applies retroactively, and that the trial court erred by finding that the informed consent documents that he and Danielle signed as "Intended Parents" did not satisfy the "otherwise agreed to in a writing" requirement for the exception to apply. Like the trial court, we need not determine whether the amendment applies retroactively, because we conclude the trial court's finding was correct.

Jason contends that the writing required for the exception to apply "need not amount to a formal, enforceable contract, and may, along with evidence of the surrounding circumstances, show an agreement or confirm an understanding that the sperm donor will have the status of a parent recognized by the law." That may be so, but the informed consent forms at issue here do not in any way address any understanding or agreement between Jason and Danielle of Jason's legal status regarding parentage. Instead, the documents -- titled "Informed Consent for Micromanipulation," "Informed Consent for Oocyte Collection," "Informed Consent [for] Human Embryo Cryopreservation," and "Informed Consent for Embryo Transfer (In Vitro Fertilization)" -- address only the medical procedures that were to be performed on Danielle. The fact that Jason is listed in the spaces for "Intended Parent" says nothing about the parties' understanding regarding his *legal* status as a parent. Therefore, the trial court correctly found that even if the 2011 amendment applies in this case, the informed consents do not satisfy the "agreed to in a writing" requirement.

D.    *Jason's Constitutional Argument is Moot*

Jason contends that an interpretation of section 7613(b) that precludes him from establishing parentage violates his constitutional rights as a biological parent.

16

Because we hold that section 7613(b) does not preclude him from establishing presumed parentage under section 7611(d), his constitutional argument is moot and we need not address it.

## DISPOSITION

The judgment is reversed. The matter is remanded with directions to the trial court to conduct further proceedings to determine whether Jason qualifies as a presumed parent under section 7611. Jason shall recover his costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.

17