Filed 3/16/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JASON P., | B268319 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BF045218) |
| v. | |
| DANIELLE S., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Maren E. Nelson, Judge. Affirmed in part, conditionally reversed in part and remanded with directions.

Glaser Weil Fink Howard Avchen & Shapiro, Fred D. Heather; Kirkland & Ellis, Danielle Sassoon, Michael Shipley and Jay P. Lefkowitz for Defendant and Appellant.

Arnold & Porter, Sally Pei, Said O. Saba, Jr., and Lisa S. Blatt for Choice Moms LLC as Amicus Curiae on behalf of Defendant and Appellant.

Fred Silberberg Professional Corp., Fred Silberberg; and Edward J. Horowitz for Plaintiff and Respondent.

This long-running case involves the effort by a sperm donor (Jason P.) to establish that he is a legal parent of a child conceived through in vitro fertilization (IVF) using his sperm, and that he is entitled to joint legal and physical custody of the child with the child's mother (Danielle S.). The case is before us on appeal for the second time. The first appeal was taken by Jason from the family law court's judgment in favor of Danielle on Jason's petition to establish parental relationship. The family law court found that Family Code[1] section 7613, subdivision (b) (hereafter, section 7613(b)) precluded Jason from establishing parentage.[2] We reversed, holding that section 7613(b) "only . . . preclude[s] a sperm donor from establishing paternity based upon his biological connection to the child, and does not preclude him from establishing that he is a presumed parent under section 7611[, subdivision (d) (hereafter, section 7611(d))] based upon postbirth conduct." (*Jason P. v. Danielle S.* (2014) 226 Cal.App.4th 167, 176 (*Jason P. I*).) We remanded the matter with directions to the family law court to conduct further proceedings to determine whether Jason qualifies as a presumed parent under section 7611(d). (*Id.* at p. 181.)

---

[1]     Further undesignated statutory references are to the Family Code.

[2]     Section 7613(b) provides in relevant part: "The donor of semen provided to a licensed physician and surgeon or to a licensed sperm bank for use in assisted reproduction by a woman other than the donor's spouse is treated in law as if he were not the natural parent of a child thereby conceived, unless otherwise agreed to in a writing signed by the donor and the woman prior to the conception of the child."

As directed, the family law court conducted those proceedings, and concluded that Jason met the requirements to be a presumed parent. The court then conducted further proceedings on custody and awarded Danielle sole legal custody for six months, after which Danielle and Jason would exercise joint legal custody, provided that Jason satisfied certain conditions. The court also ordered a "step-up plan" to a shared parenting arrangement, and ordered Jason to pay child support, retroactive to the date of entry of the court's statement of decision regarding parentage.

In this second appeal, Danielle challenges the family law court's finding that Jason is a presumed parent and the court's custody order. She contends the court (1) erred by misapplying the statutory requirements for presumed parentage and improperly relied upon Jason's biological connection in finding him a presumed parent; and (2) improperly awarded Jason custody in contravention of section 3044, which creates a presumption against awarding custody to a parent who has perpetrated domestic violence. We conclude the family law court correctly applied the law governing presumed parentage, and its finding that Jason is a presumed parent is supported by substantial evidence. We also conclude, however, that the court's award of joint custody was premature because it had not yet received evidence that Jason completed the requirements the court deemed necessary to rebut the section 3044 presumption.

Accordingly, we affirm the judgment as to the parentage finding, but conditionally reverse the judgment as to the award of custody. On remand, the family law court is directed to conduct limited proceedings

3

to determine and make findings as to whether Jason satisfied the conditions the court deemed necessary to rebut the section 3044 presumption. If the court determines he has done so, it may reinstate its award of joint custody. If the court determines he has not done so, it shall enter a new custody order, taking into account that the section 3044 presumption has not been rebutted.

## BACKGROUND

The family law court issued very detailed statements of decision regarding parentage and custody that included extensive findings of fact and credibility determinations. Our discussion of the facts is based upon those findings, which were supported by substantial evidence. (See *R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 780 [when reviewing a court's finding of presumed parentage, "[w]e view the evidence in the light most favorable to the ruling, giving it the benefit of every reasonable inference and resolving all conflicts in support of the judgment. [Citation.] We defer to the trial court's credibility resolutions and do not reweigh the evidence"].)

A.    *Events Leading Up to the Birth of the Child*

Danielle is a certified rolfer.[3] She met Jason, who is an actor, through a client of hers in 2002. She and Jason began a romantic relationship about six months after they met. In 2005, she sold her condominium and moved into Jason's home in Santa Monica.

---

[3]    Rolfing is a form of physical therapy.

4

From November 2006 to December 2007, Danielle and Jason tried to conceive a child. Danielle became pregnant at one point, but miscarried at six weeks. They tried to conceive after the miscarriage, first by natural methods and then using fertility procedures. In 2007, Danielle had two intrauterine insemination (IUI) procedures in New York using Jason's sperm.[4] Both were unsuccessful. In September or October 2007, Jason had a surgical procedure to increase his sperm count.

By May 2008, their relationship was strained, and Danielle moved out of Jason's home and into a rental property; Jason paid the rent on the property. Danielle testified that she moved out because Jason said he no longer wanted to be a father. Jason testified he just asked her to wait.[5] A month later, Danielle purchased sperm of an anonymous donor from a sperm bank; she told Jason about her purchase at some point afterwards. At the time she purchased the sperm, she understood that she would have all the parental rights and responsibilities related to any child conceived with that sperm. Sometime later, in the fall of 2008, she found a website called "Choice Moms" or "Single Mothers By Choice" that had a link to a page describing the rights of women in California who conceive using the sperm of a known donor; she

---

[4] During this time, Danielle was living with Jason at Jason's apartment in New York.

[5] An email Danielle sent to her cousin appears to confirm Jason's account. Danielle told her cousin that she moved out because she and Jason agreed to take time apart.

understood that under California law, the known donor would not have rights as a father.

In September 2008, Danielle bought a home near Jason's in Santa Monica. She was staying with family on the east coast at the time she bought the property. When she came back to California, she stayed at Jason's house, and lived there for the first six months of 2009. She testified that she stayed at Jason's house because there was construction going on at her newly-purchased home, but she told her cousin in an email that she "moved back in with him temporarily for us to try to figure things out."

In November 2008 or January 2009, Jason gave Danielle a long handwritten letter.[6] In it, Jason discussed his inner turmoil and emotional struggles, and the troubles in their relationship. Toward the end of the letter he wrote: "There is no doubt in my mind that you were meant to be a mother. You know it and feel it so deeply. There is also no question that you would and will be a wonderful one. You will give all the love you never had, plus all the love you've learned, lived, and shared. You are ready to be a mom right now. Whether due to time, or need, once again it doesn't matter – time says now. I am not ready to be a father. Can I be? Of course. I can assume the responsibilities, and march along as I always have. But I want to be excited about the idea, the process, the anticipation. I don't want to be grudgingly brought into

---

[6] Jason testified that he gave the letter to Danielle in November 2008. Danielle testified that he gave it to her on January 12, 2009. The timing is not relevant to this appeal.

being a daddy. And I say this knowing that maybe I'll never be so sure and at ease with the commitment. Maybe it's not my lot. But I would hope that it could be. I really do. I hope my fucked up life and misaligned choices have not ruined me. I truly do. I just know that I need to have my best effort at clarity, if not surety, to have the chance of family, and being fulfilled as a creative force. . . . I need to go away for several months and try and write something that can fix me. . . . I know you can't wait. I don't want you to. . . . I have to find my way Dan. It's only then that I can give to anybody. I don't know if I'll ever be a dad. But I know if I ever had a kid, and I needed someone to care and raise them, I would trust you. Everything you are. I want [you] to know that if you want to use my sperm, you have my blessing. It's all I can give you right now. Maybe ever. I'm so lost. Maybe in a few months – I'll be clear. Maybe I'll have needs and vigor to cho[o]se them. And maybe I'll feel the same way. Alone, needing space, or will have changed in ways unknown. But what I will know, is that I was able to give a gift to you. One that one day I may be able to feel and embrace. And if not, I will know that you are fulfilled in that part of your journey – and a piece of me is living through you and in the world. It just has to be between you and I. That's all I ask."

In January 2009, Danielle underwent an IUI procedure using sperm that Jason provided, rather than using the anonymous donor sperm. The procedure was unsuccessful.

In March 2009, Danielle underwent IVF using Jason's sperm. Jason took her to California Fertility Partners for the egg retrieval on

March 6, and took her back for the transfer of the embryo on March 9. The IVF resulted in a viable pregnancy.

The only people Danielle initially told about her pregnancy – and that Jason was the biological father – were her brother, her sister Elisabeth (Liz), and her two closest friends, Ellen Rapoport and Joshua Weinstein, but she asked each of them not to reveal who the biological father was. She later explained to her cousin that Jason "didn't want anyone to know because he's so private and self-conscious/neurotic." Although Jason denied to some people that he was the father of Danielle's baby during the pregnancy, he did tell his close friend Bryony Atkinson and her husband Scott Seiver, his personal trainer Flavio de Olivira, and Cynthia Burton, the mother of his former girlfriend, that Danielle was pregnant with his baby.

After the IVF, Danielle stayed in the guest room at Jason's house until she was approximately 17 or 18 weeks pregnant. Jason was gone for much of that time. However, he was home when, at around 10 weeks, Danielle started to bleed, and he took her to the emergency room. She was put on bed rest for seven or eight weeks, and stayed at Jason's house until she was able to work again. At that point, she moved into her home.

Danielle made all the arrangements for the baby's room in her home, except buying a crib; her grandmother bought the crib and had it delivered to Jason's home because she believed it was bad luck to send baby items to Danielle's home before the baby was born. Danielle also made arrangements for a doula and a night nurse, and selected a pediatrician. Her sister Liz set up a registry for gifts for the baby.

Jason was not involved in any of those activities, nor did he attend any childbirth classes with Danielle.[7]  However, shortly before the baby was born, Jason sent an email to Danielle telling her to "make sure [her] midwife and nurse have all been vaccinated for swine flu.  [I]f not they can't be used."  Jason and Danielle also discussed names for the baby. Danielle chose the name Gus Theodore; Gus was for one of Danielle's family members, and Theodore was for one of Jason's family members.

B.    *The Period From Gus' Birth to His First Birthday*

Gus was born in early December 2009.  Shortly before Gus was born, Jason discovered that a caretaker for his grandmother, who lived in New York and with whom he was very close, was stealing from her. Because Jason was responsible for his grandmother's care, he had to fly to New York to take care of the situation and find a new caretaker.

While Jason was in New York, Danielle went into labor.  Liz took Danielle to the hospital and stayed with her for most of the nearly two days in which Danielle was in labor.  Ultimately, Danielle had an emergency caesarean section.  Jason flew back to Los Angeles, but did not arrive in time for the birth; he got to the hospital shortly after Danielle came out of the recovery room.  Jason did not hold or ask to hold Gus – he testified he was overwhelmed and afraid of hurting him –

---

[7]    With regard to the childbirth classes, Jason testified that Danielle did not ask him to attend, and knew that he was uncomfortable in intimate public situations.

and did not take any photographs or ask to have any photograph taken of him with Gus.

Jason stayed at the hospital for about a half-hour. He did not tell anyone at the hospital that he was Gus' father, did not make arrangements to have his name put on the birth certificate, and did not sign a voluntary declaration of paternity. He testified that he did not put his name on the birth certificate for privacy reasons. He explained he wanted anonymity for his child as long as possible, because he was a celebrity and grew up in a celebrity family (both his father and grandfather were quite famous, and appeared in theater, television, and movies), and he found the attention that brought to be extremely intrusive. He did, however, tell all of the people that were close to him about Gus' birth.

Liz drove Danielle and Gus home from the hospital. Jason testified that he did not drive them because he had to go pick up Danielle's favorite bagels for her, get celebratory balloons, and walk the dogs to prepare for her arrival.

When Gus was first brought home from the hospital, Liz and a night nurse assisted Danielle. Jason spent time at Danielle's house in the days after Gus was born, to help burp Gus and tuck him in in the evening. When Gus was eight days old, Jason took Danielle and Gus to a medical appointment to have Gus circumcised. For Gus' first Christmas, a few weeks after Gus was born, Jason brought a Christmas tree and decorations to Danielle's house, and gave Gus a "onesie" that had "Baby's First Christmas" written on it.

During 2010, Jason often was away from Los Angeles; he went to New York every four or five weeks to take care of his grandmother and conduct business, and was in Canada for work for three weeks. Although Jason testified that he went to Danielle's house to see Gus almost every day that he was in Los Angeles,[8] Liz, who helped Danielle with Gus at least three or four times a week, testified that she saw Jason with Gus only sporadically. Similarly, Danielle's friend Joshua Weinstein, who saw Danielle at her house almost weekly, testified that he rarely saw Jason there in 2010, and did not see Jason do anything that suggested he was parenting Gus; instead, he usually was watching television or on the computer.

Danielle and Gus, accompanied by Liz, went to New York three times in 2010. They did not stay at Jason's apartment, but instead stayed at Danielle and Liz's father's home. Danielle and Gus visited with Jason while they were there, and went to parks with him. Danielle also took Gus to visit Jason's grandmother, and took a photograph of Gus with her.

Throughout Gus' first year, Jason and Danielle exchanged emails with information about raising children, vaccinations, and events in Gus' development, and occasional requests from Danielle for Jason to babysit Gus. In late June 2010, Danielle decided to "take time away"

[8]     In late February 2010, Danielle wrote in an email to her cousin that "Jason has been over at my place a lot. He seems to be getting attached to [Gus]." Danielle and Gus also stayed with Jason at his house in Santa Monica on two occasions in 2010; in February 2010, when work was being done on the air ducts in Danielle's home, and in August 2010, when the air conditioning at Danielle's home was not working.

11

from Jason while he was in Canada for work; they agreed they were not going to talk while he was gone. Danielle told Weinstein that Jason was "only worried about not seeing Gus – even though I told him I would never keep Gus from him."

Their time away from each other was short-lived. In August 2010, Jason and Danielle were at the Brentwood Country Mart with Gus when they ran into Erin Dignam, a longtime friend of Jason (who also had known Danielle for 11 years). Dignam and her two daughters spent most of the day with Jason, Danielle, and Gus. Dignam assumed that Jason was not Gus' biological father because Danielle had told her in 2008 that she and Jason had fertility problems. Based on Jason and Danielle's behavior, however, she believed that Jason was Gus' father.

C.     *The Period From Gus' First Birthday to the Filing of the Petition*

In December 2010, Jason attended Gus' first birthday party at Danielle's house. In December 2010 or January 2011, Jason and Danielle resumed their romantic relationship, and Jason began working in New York on a Broadway play. The play started rehearsals in January 2011, opened in March 2011, and ran through mid-May 2011.

In early January 2011, Danielle's father sent Danielle an email expressing concern about her renewed relationship with Jason, which her father worried might be an abusive relationship. Danielle responded that she was not in an abusive relationship and said that she "want[s] (and intend[s] for) Gus to have two full-time and fully-devoted parents."

Jason got to New York in January 2011, and hired Dena Douglass as his assistant. When Jason interviewed Douglass for the job, he asked her if she had any experience with children; Douglass told him her previous job had been as a nanny. Jason explained that he had a son, Gus, and that her job duties would include taking care of Danielle and Gus when they were in town. They discussed various things regarding Gus, such as items that would be needed while Gus was there, food-related issues, and setting up the house in preparation for his visits. The day after she interviewed for the job, Douglass went to Jason's apartment, and Jason showed her around. She saw a jogging stroller, baby clothing, diapers and baby ointment, a child's toothbrush, toothpaste and shampoo, a crib, a baby toilet, a high chair, and a gate, along with children's books and toys. She also noticed photographs of Gus, and of Jason and Gus, in both bedrooms.

Danielle and Gus visited Jason in New York four or five times while Jason was there for the play, staying for about a week each trip.[9] Jason paid for their airplane tickets, and also gave Danielle money to make up for the fact that she had to miss work. Their first visit was in late January 2011. Douglass met them on their second visit, in February. When Douglass arrived at the apartment the first morning of their visit, Danielle and Gus were there, and Jason was feeding Gus breakfast. Over the course of their visit, Douglass observed Jason feeding Gus, playing with him, and taking Gus to the park. Jason

---

[9] They also came to New York once in the summer of 2011, when Jason's grandmother was very ill, and again in November 2011.

13

called Gus his son, and Gus called him "Dada"; Danielle also referred to Jason as "Dada" and encouraged Gus to do so.

Danielle and Gus returned to New York to attend the opening night of Jason's play in early March 2011. On March 16, while back in Santa Monica, Gus became ill and was hospitalized for four days. Jason was doing eight performances a week in the play at that time; the only day without a performance was Monday. He spoke with Danielle more than 50 times during Gus' hospitalization, and asked if he should come home; Danielle assured him that Gus was stable, and he did not need to come home. He also called his friend Erin Dignam because she had a lot of doctors in her family, and asked for her help; Dignam called Danielle to offer her assistance.

Danielle told Jason that Gus was going to be released from the hospital on Sunday, March 20, 2011. Jason decided to fly from New York to Los Angeles after the Sunday matinee performance. He arrived in Los Angeles just before midnight, and went directly to Danielle's house, arriving at around 12:30 a.m. on Monday, so he could be there when Gus woke up. He spent the entire day with Gus, and took a flight back to New York on Tuesday morning; when he landed in New York, he went directly to the theater to be there in time for that evening's performance.

Danielle and Gus went to New York again in mid-April 2011. During that trip, Jason arranged for Gus and Danielle to visit the set of his play. There was a trophy that was the centerpiece of the play, and each of the actors was allowed to have the name of a family member engraved on it. Jason chose "Gus Theodore" for his engraving. Jason

14

was photographed showing Gus the trophy.  There also was a video taken onstage, in which Danielle referred to Gus as a "chip off the old block."  When she and Gus were back in Santa Monica, Danielle made a video of Gus looking at the playbill from Jason's play and asking him to point to "Dada" in the photograph on the cover.  She also made a video of him looking at a photograph of Jason's hands while she asked him if those hands were "Dada's" hands.

Jason returned to Los Angeles after the play closed, and spent several days and nights at Danielle's house in June 2011.  During that time, Gus was attending a toddler program at a preschool in Santa Monica, The First School.  The daughter of Jason's friend Kristen Prouty also attended the program.  Prouty testified that she observed Jason participate in "Circle Time" at the school, during which the parents (mostly mothers) sat in a circle and asked the teachers about child development and issues they were going through with their children.

Throughout the rest of 2011, Jason continued to go back to New York every four or five weeks to take care of his grandmother.  In addition, he was away for much of the month of July, working on a show in Chicago.

Danielle testified that in July and August of 2011, Jason started to become more abusive and began "to insert himself into how [she] was parenting and raising [Gus]."  On July 5, he made anti-Semitic remarks to Danielle, who is Jewish, and then left for Chicago.  Despite this, Danielle emailed him six days later, and again a couple of weeks later, telling him that she and Gus missed him.  On July 29, she sent him an

email telling him she was looking forward to him being back in Santa Monica for many reasons, one of which was that it would make it easier to wean Gus.

Jason was back in Santa Monica in August 2011. Around August 6 or 7, Jason made another anti-Semitic remark to Danielle in Gus' presence, and made another in late September during Circle Time at Gus' toddlers program in front of some teachers, parents, and children.

Jason, Danielle, and Gus went on a vacation together to Hawaii in September 2011. In connection with that trip, Danielle emailed a travel agent, telling her that she would "like to plan a trip with my boyfriend Jason and our 20 month old son." The three of them were photographed by paparazzi during that trip.

In late September 2011, Danielle and Jason argued about how to help Gus sleep through the night; Danielle did not like that Jason had Gus sleep all night on her couch with him. Jason sent an email to Danielle, telling her he was "extremely upset," and complaining that she was "us[ing] Gus and the implicit threat of access to him, as a power chip in [their] relationship." In her response, Danielle suggested that they return to therapy, and said: "I will not allow myself to be strung along without a proper discussion about what our plans are – it seems like that's what you're avoiding every time you go to NYC to see your grandma and extend your stay – and I find it dishonest. You want to live your double life, but you expect me to be always available and accountable. . . . The arguments that we have about Gus are arguments that any other couple with children might have, but they get complicated by the lack of definition that continues to plague our

16

relationship. . . . [W]hen [Gus] cries for me to pick [him] up at the park sometimes and [you] say to me don't pick him up, I listen to you. I respect your plan and [know] that we as parents need to not undermine each other cuz then Gus will play us against each other and feel like there is no order or structure. Even tho we may have our own styles of parenting, we still have to not undermine one another."

In November 2011, Jason and Danielle took Gus to get his first haircut. Gus sat on Jason's lap while getting his haircut, during which Gus asked "Dada" to play with a toy alligator that was next to the chair. Jason also attended some of Gus' appointments with his pediatrician in October and November, and was identified in the doctor's records as Gus' father.

In early November, Danielle and Jason had an argument about what Jason fed, or attempted to feed, Gus one evening. Danielle sent an email to Jason, explaining why she did not want Jason to feed Gus what he tried to feed him. She noted, "You've made it clear you think I don't know what I'm talking about when it comes to this. I know you disagree, but I'm beginning to think you're doing this just to exert power/control." She told him she felt he treated her in an abusive way, speaking with contempt and bullying her. In Jason's response, he accused Danielle of "pulling rank" on him when it came to parenting decisions. Danielle responded, "Pull 'rank'? Bullshit. I am [G]us' mama and you are his dada. How does 'rank' factor in? You see

yourself in competition with [D]ira[10] as well.  I didn't anoint myself boss of Gus.  I'm his primary caretaker.  You don['t] want to be."

Gus' second birthday was celebrated in early December 2011.  Jason and Danielle planned a party for him.  Although the invitation that was sent out listed only Danielle as the host, Jason made the arrangements for the birthday cake, the music, and other entertainment.  A video taken at the party shows Jason holding Gus as Gus blows out the candles on his cake.

Shortly after Gus' birthday, Jason and Danielle met with the preschool director at Little Dolphins School and toured the school.  The director understood that Danielle was Gus' mother and Jason was his father.  Danielle wrote a note to the director thanking her "for taking the time to meet with Jason and me today (and for feeding us yummy treats too!).  We tend to be listeners and you certainly answered all of our questions and more."

Danielle had been exploring preschools for Gus for a few months.  She had applied to some schools in late 2010 and early 2011, and did not list Jason as Gus' father; she listed herself as a single parent.  Gus was not accepted at any of them.  Jason and Danielle had several discussions about whether Gus should attend The First School, where he was attending a toddlers program, or Little Dolphins, and ultimately chose Little Dolphins.  When Danielle filled out the application to Little Dolphins, she listed Jason as Gus' father and submitted a photograph of the three of them together.

---

**10**     Dira Galindo worked for Danielle as Gus' nanny in 2011.

18

When Gus was enrolled in the school in February 2012, both Danielle and Jason signed the enrollment contract. Jason provided a check for $2,500 for the initial deposit.[11] Jason's contact information was provided for the emergency contact information section. In response to a question in the pre-admission health history report asking about how the child gets along with parents, brothers, sisters, and other children, Danielle wrote "Yes. Both mother and father and dogs."

Jason and Danielle's relationship remained unsettled in early 2012. They continued to argue, and Danielle continued to feel that Jason was abusing her and trying to control her through Gus, yet they continued to express affection for one another. Jason continued to be a presence in Gus' life. When Jason was in town, he would go to Danielle's house in the mornings to feed Gus his breakfast or take him to the park, sometimes with, and sometimes without, Gus' nanny Galindo. He also occasionally would go to Danielle's house in the evening to help put Gus to bed. On one occasion, he took Gus to the pediatrician by himself (although Danielle joined them 10 minutes after the appointment started). On Easter weekend, Danielle, Jason, and Gus spent the weekend in Malibu with Jason's friend Atkinson, her husband, and their young son. In late April, Danielle asked Jason whether they should have Gus attend a summer Spanish immersion camp.

---

[11]   This was the only direct payment Jason made to the school; Danielle paid the balance of the tuition.

In May 2012, Jason was in Canada shooting a movie. He kept in touch with Gus through "tons and tons" of Skype sessions. Danielle made a video showing her encouraging Gus to "say 'thank you' to Dada" for a present Jason sent to him. Jason asked Danielle to come for a visit in Canada with Gus, but Danielle did not want to take Gus on such a long trip; she testified that she also was worried that Jason would take Gus from her.

D.      *Events Leading Up to and Following the Filing of This Lawsuit*

Danielle testified that she broke up with Jason in May 2012, and that on May 29 and June 12, Jason threatened to sue her, telling her, "if you're breaking up with me, be prepared to spend a lot less time with Gus. I am going to go for full custody." Both parties spoke to lawyers about their disputes. On advice of her counsel at the time, Danielle agreed to allow Jason visitation with Gus four times a week during the early part of summer.

On June 25, 2012, Danielle sent Jason an email in which she said that she was "prepared to meet with a child specialist" regarding custody. She told him, "I have no interest in denying Gus a relationship with his father. It's the opposite. I promote it. It is in Gus' best interest that we spend time with him one on one, so he gets used to you taking him on outings by yourself." After noting that Jason had been gone for much of the time after Gus' birth and had not changed a diaper, she asserted that he was "trying to log in as many hours as possible with Gus for the record and to assert control over both Gus and me. You know the truth, so please stop lying."

20

1. *First Trial and Appeal*

Jason filed the petition to establish parental relationship the next day. He contended that he was not a sperm donor within the meaning of section 7613(b), and that he was a presumed parent under 7611(d). The family law court (Hon. Stephen Maloney) granted Jason pendente lite visitation pending the outcome of the trial on the petition. The court ordered that the case be tried in phases, with the issue of the applicability of section 7613(b) to be tried first.

After close of evidence in the first phase, the family law court (Hon. Mark Juhas) granted Danielle's motion for nonsuit, finding that Jason was a sperm donor within the meaning of section 7613(b), and that, under *Steven S. v. Deborah D.* (2005) 127 Cal.App.4th 319, he therefore was precluded from establishing paternity. On February 19, 2013, the court vacated the pendente lite visitation order and denied Jason's request for custody of and/or visitation with Gus during pendency of the appeal.[12] The court filed a statement of decision and a judgment on April 16, 2013.

Jason appealed from the judgment. On May 14, 2014, we reversed the judgment in a published decision, and remanded the matter with directions to the family law court to conduct further proceedings to

---

[12] Although Danielle had said that she would allow Jason to continue to see Gus even though he did not have parental rights, neither she nor her counsel offered any visitation proposal, and she demanded that Jason "recant" statements he made to the media as a precondition to any visitation. Jason refused. Therefore, at the time the family law court issued its statement of decision on parentage in the retrial that is the subject this appeal, Jason had not seen or communicated with Gus for almost two years.

determine whether Jason qualifies as a presumed parent under section 7611.  (*Jason P. I*, *supra*, 226 Cal.App.4th at p. 181.)

### 2.  *Domestic Violence Restraining Orders*

After the family law court issued its statement of decision finding no parentage, Jason engaged in harassing behavior.  He sent a series of intimidating emails to Danielle, texted her, and called her.  He threatened Danielle's father in an email, and sent intimidating emails to Danielle's friend Weinstein and Gus' nanny.

Danielle sought a domestic violence restraining order against Jason.  The court (Hon. Stephen M. Moloney) granted Danielle's request on November 25, 2013, finding that Jason disturbed Danielle's peace within the meaning of section 6320 by sending harassing messages after the family law court's parentage ruling.  The court specifically found that Danielle did not show domestic violence under section 6203, subdivisions (a), (b), or (c).[13]  Jason was ordered not to "[h]arass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk,

---

[13]     Under the Domestic Violence Prevention Act (§ 6200 et seq.), "domestic violence" is defined as "abuse perpetrated against" certain persons, including a former cohabitant.  (§ 6211.)  The statutory definition of "abuse" states that "[a]buse is not limited to the actual infliction of physical injury or assault" (§ 6203, subd. (b)), and includes "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320" (§ 6203, subd. (a)(4)).  The behavior that can be enjoined under section 6320 includes threatening, harassing, telephoning, contacting by mail or otherwise, or disturbing the peace of the other party.  (§ 6320, subd. (a).)  Thus, a domestic violence restraining order may be issued even when there has been no physical violence.  (See *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1496-1499.)

molest . . . [or] [c]ontact" Danielle "directly or indirectly, by any means, including, but not limited to, by telephone, mail, e-mail or other electronic means." The court did not issue a stay away order as to Danielle or Gus.

Danielle filed a request to renew the restraining order on November 21, 2014. The family law court (Hon. Maren Nelson) found that the evidence presented at the hearing on the renewal request showed that Jason had not read the terms of the original restraining order, and believed he had the right to contact any person who "lied" about the case. The court found that Jason made several contacts with Weinstein, even after Weinstein asked him not to contact him, and that he made inappropriate contact with Danielle's father. Danielle contended that these contacts made her fear that Jason would once again disturb her peace if the restraining order were lifted. The court concluded that the evidence was sufficient for renewal of a restraining order in light of the standard established for such renewals, and renewed the restraining order for the minimum term permitted.

3.    *Second Trial*

On remand, Jason requested a pendente lite visitation order. The newly-assigned family law judge, Hon. Maren Nelson, denied his request, and set the matter for trial. The court ordered that, as to third party witnesses, it would take their testimony by way of the reporter's transcript from the first trial. Danielle filed a motion in limine to exclude evidence of Jason's post-petition conduct. She observed that in our decision reversing the denial of Jason's petition we held that a

23

mother may limit a sperm donor's contact with the child to prevent him from becoming a presumed parent, and argued that Jason's post-petition conduct should not be used by him to establish presumed parentage because the family law court had imposed a visitation order right after the petition was filed. The family law court granted the motion.

The family law court conducted a three-part trial. The first part, which addressed the presumed parentage issue, took seven and a half days, from September 2 to September 11, 2014. The court issued a proposed statement of decision regarding parentage on October 31, 2014, and a final statement of decision regarding parentage on December 29, 2014, in which it concluded that Jason met his burden to show that he is the presumed father of Gus and that Danielle did not rebut the presumption.

The second part of the trial addressed custody and visitation. The family law court heard four days of testimony and issued an oral tentative statement of decision on January 15, 2015. A written proposed statement of decision was served on February 9, 2015, and the final statement of decision regarding custody and visitation orders was filed on March 10, 2015.

The court found, among other things, that Jason failed "at this time" to rebut the section 3044 presumption against custody for parents who have perpetrated domestic violence. However, the court noted that the domestic violence in this case did not involve any physical violence and instead consisted of Jason's inappropriate verbal harassment. The court concluded that, in light of the nature of the domestic violence at

issue, the successful completion of individual counseling by Jason and participation in joint counseling by both Jason and Danielle would be sufficient to rebut the presumption. The court also found that it was in Gus' best interest to reduce the level of conflict between his parents, particularly related to the litigation, by providing a self-executing mechanism for future joint legal custody and a step-up parenting plan. Therefore, the court ordered that Danielle would have sole legal custody for six months, and that after six months Danielle and Jason would exercise joint custody, provided that Jason completed a six-month course of counseling for the purpose of helping him to develop tools to deal with his anger and frustration. The court also ordered a step-up parenting plan, to begin immediately after Danielle and Jason met with a designated counselor to obtain advice on how to communicate with Gus regarding Jason being reintroduced into his life; that counseling was previously ordered to take place on February 4, 2015.

The third and final part of the trial addressed child support and attorney fees. The court took testimony over five days in April 2015 and issued a proposed statement of decision in June 2015. The final statement of decision was issued on July 13, 2015. The court ordered Jason to pay Danielle for child support, retroactive to December 29, 2014, the date the final statement of decision regarding parentage was filed. The court denied Danielle's request that Jason be ordered to pay her attorney fees, and ordered that Jason bear his own attorney fees.

The final judgment was entered on September 4, 2015. Danielle timely filed a notice of appeal from the judgment.

25

On appeal, Danielle challenges the family law court's finding that Jason is the presumed father of Gus and the court's order awarding joint custody.

A.    *Presumed Parentage Issues*

As noted, we held in the first appeal that section 7613(b) precluded Jason from establishing that he is Gus' father based upon his biological connection, but the statute did not preclude him from establishing that he is Gus' presumed parent under section 7611(d) based upon his postbirth conduct.  (*Jason P. I, supra*, 226 Cal.App.4th at p. 176.)

Section 7611(d) provides that a person is presumed to be the natural parent of a child if "[t]he presumed parent receives the child into his or her home and openly holds out the child as his or her natural child."  We explained in our earlier decision that "'"[t]he statutory purpose [of section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not."'  [Citation.]  A biological connection to the child is not necessary for the presumption of paternity to arise.  [Citation.]  Nor is it necessary for the person seeking presumed parent status to have entered into the familial relationship from the time of conception or birth.  '[T]he premise behind the category of presumed father is that an individual who has demonstrated a commitment to the child and the child's welfare – regardless of whether he is biologically the father – is entitled to the elevated status of presumed fatherhood.'

[Citation.]" (*Jason P. I, supra*, 226 Cal.App.4th at p. 177.) As the Supreme Court has observed, "'The paternity presumptions are driven by state interest in preserving the integrity of the family and legitimate concern for the welfare of the child. The state has an "'interest in preserving and protecting the developed parent-child . . . relationships which give young children social and emotional strength and stability.'"'" (*In re Nicholas H.* (2002) 28 Cal.4th 56, 65.)

Danielle contends that, in finding that Jason was Gus' presumed father, the family law court (1) improperly relied upon Jason's biological connection to Gus; (2) erred by liberally interpreting the statutory requirement that the presumed parent must receive the child into his or her home, and ignored that this requirement requires evidence of parental caretaking; (3) improperly found that Jason met the statutory requirement that the presumed parent must hold the child out as his or her own because Jason did not unequivocally hold Gus out as his own to the community; (4) improperly allowed Jason to belatedly pursue fatherhood after he initially rejected it; and (5) improperly relied upon Danielle's behavior in finding that Jason was a presumed parent. We are not persuaded.


1.      *The court did not rely upon Jason's biological connection to Gus*

In contending that the family law court improperly relied upon the fact that Jason has a biological connection to Gus in finding that Jason is Gus' presumed father, Danielle points to the opening sentence of the court's statement of decision, in which it refers to Jason as "the biological father of Gus" rather than as the sperm donor. She contends

27

that "[t]he court's disregard of the paucity of fatherly conduct on Jason's part can only be explained as impermissible reliance on this headline fact, because the rest of the evidence was so thin." Her contention is not supported by the record.

Although the court referred to Jason as Gus' biological father – a true statement – rather than as a sperm donor, it expressly stated that "[i]t is not Jason's status as a sperm donor that gives rise to his status as a presumed father under section 7611(d). Rather, it is his conduct, encouraged by Danielle, after Gus was born." If there were any doubt, the body of the statement of decision makes clear that the court relied solely on Jason's conduct in concluding that Jason met the requirements of section 7611(d) and developed a parental relationship with Gus. For example, in finding that Jason had developed a familial relationship and commitment to Gus, the court noted that even though Jason and Danielle were not in a dating relationship in 2010, Jason "frequented Danielle's home and spent time with Gus there and at his home in Santa Monica" when he was in town, and by June 2010 he was "worried about not seeing Gus" when Danielle told him she wanted to take time away from him while he was working in Canada. The court identified this conduct as Jason "taking tentative steps to build a relationship with Gus, encouraged by Danielle." The court also observed that once Jason and Danielle renewed their romantic relationship, "Danielle made great efforts to encourage Jason to build a familial relationship, teaching Gus to call Jason 'Dada' and involving Jason in feeding and playing with Gus."

The court acknowledged that Danielle had been Gus' primary parent since his birth, assisted by her sister Liz and a nanny, and that Jason was "not a paragon of parenting. He used language in front of Gus that was disrespectful and demeaning of Danielle. He failed to respect Danielle as Gus' primary parent. Gus never spent the night at Jason's home with only Jason. Jason never changed Gus' diaper. Jason was absent from Gus' life for long periods, due in part to work commitments and in part to his own choices regarding his personal life. Jason never paid Danielle money directly earmarked as child support, and he did not directly name Gus as the beneficiary of his estate."[14] The court found, however, that "[t]hose facts . . . do not mean Jason did not take on the role of a parent in Gus' life or is not committed to his welfare. While the parties did not equally share parenting responsibilities, this is often the case in family situations where a parent travels for a living or otherwise, and leaves much of the child rearing to the other parent and/or domestic help."

The court pointed to examples of Jason's conduct in which he took on a parental role: when Gus was hospitalized, he was in regular contact with Danielle and came to Los Angeles to see him as soon as his

_____

[14] In its findings of fact, the court found that Jason told Danielle to let him know if she needed money, and that he gave Danielle checks or wire transfers totaling $81,000 in 2009 through 2012, but the court noted the parties disputed what those payments were for. The court also noted that there was no evidence to show whether Jason would have been required to pay child support given the parties' respective financial situations. In addition, the court found that, although Jason had not named Gus as the beneficiary of his estate or life insurance, Danielle is the sole beneficiary of Jason's estate under his will.

work permitted, he participated in the selection of Gus' school, he participated in "Circle Time" at The First School and Little Dolphins, he went to some of Gus' lessons at Gus' request, he taught Gus music, he helped in potty training, and he sought to be involved in parenting decisions regarding Gus. The court also noted that third parties, such as Dignam, Gus' pediatrician, and personnel at Little Dolphins perceived Jason as Gus' father, and that Danielle herself "recognized Jason as a parent to Gus, reminding him that the two should not undermine each other . . . and that there was no 'rank' between them: 'I am gus' mama and you are his dada.'"

In short, the statement of decision makes clear that the court's finding that there was a parent-child relationship between Jason and Gus was based upon Jason's conduct, rather than his biological connection to Gus. To the extent Danielle argues that this finding was erroneous because Jason failed to satisfy many of the factors identified in *In re T.R.* (2005) 132 Cal.App.4th 1202, 1211 – such as whether the presumed father helped the mother with prenatal care, whether he paid pregnancy and birth expenses, whether he promptly took legal action to obtain custody of the child, and whether he sought to have his name placed on the birth certificate – her argument fails because the factors identified in *In re T.R.* are simply factors that courts may consider; there is no requirement to show that all (or even most) of them are satisfied. (*Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 376 (*Charisma*).)

30

2. *The court properly applied the receiving into the home requirement*

In describing section 7611(d)'s requirement that the child be received into the presumed parent's home, the family law court noted that it requires that the child be physically received into the home, and that constructive receipt is insufficient. (Citing *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826-830 (*Kelsey S.*)). But the court also noted that "[h]istorically there has been a liberal interpretation of 'receiving' as used in the statute. See *In re Richard M.* (1975) 14 Cal.3d 783, 794-795. Thus, where a child does not live with the person seeking presumed father status, occasional temporary visits were sufficient to meet the 'receiving' requirement particularly where the child has a residence elsewhere. . . . However, where a party has only sporadic visitations with a child or sees the child only incidental to his relationship with the child's mother, he will not be found to have received the child into his home, even if the child spent time at the home. . . . [¶] A party seeking to establish he is a presumed parent is not required to show that he acted as a parent to the child for a specific period. *Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 374 ('Receipt of the child into the home must be sufficiently unambiguous as to constitute a clear declaration regarding the nature of the relationship, but it need not continue for any specific duration.')."

Addressing whether Jason satisfied the "receiving" requirement, the court rejected Jason's contention that the parties lived as a family in both his Santa Monica home and Danielle's home, but it found that Jason did receive Gus into his home in New York. The court based its

31

finding on the facts that Gus regularly spent time at the apartment when Jason was living there, Jason made arrangements with his assistant to accommodate Danielle and Gus during their visits, he and Gus went to the park when he was not working, he fed, played music for, and read to Gus, he arranged for an allergist to see Gus in New York, he obtained a baby gate to prevent Gus from falling down the stairs in the apartment, and there was a room in the apartment that was designated as Gus' room when he was there. The court concluded that "[g]iven the historically liberal interpretation of acts sufficient to 'receive' a child into the home and the case law specifically finding that no period of any specific length is required to meet the 'receiving' requirement, the evidence is sufficient to make that finding."

Danielle contends the family law court erred by relying upon decades-old cases that liberally interpreted the "receiving" requirement because the statute being interpreted in those cases was California's legitimation statute, which provided a method for the father of a child born out of wedlock to legitimate his offspring. She observes that the courts applied a liberal interpretation to the "receiving" requirement due to the perceived disgrace associated with being an "illegitimate" child, and cites to *Kelsey*, *supra*, 1 Cal.4th at pages 828 to 829 in support of her contention that courts have abandoned the liberal interpretation of the requirement. We disagree.

We do not read *Kelsey* as holding that courts should not apply a liberal interpretation to any aspect of the "receiving" requirement; instead, the Supreme Court held that the requirement no longer could be satisfied by an alleged father's "constructive receipt" of the child into

32

his home.  (*Kelsey*, *supra*, 1 Cal.4th at pp. 828-829.)  As the appellate court in *Charisma* observed, "[a]lthough the [*Kelsey*] court declined to liberally construe the requirement in the case before it, the court did not suggest that actual receipt of a child *for a significant duration* is required."  (*Charisma*, *supra*, 175 Cal.App.4th at p. 372, fn. omitted; see also *In re M.R.* (2017) 7 Cal.App.5th 886, 900 [juvenile court found that the parental relationship was developed primarily through child's visits with presumed father, rather than from living with him].)  Indeed, "[i]f the Legislature had intended to require an alleged parent to live with a child for an extended period of time, it would likely have used a different term than 'receives' or added an express durational requirement" when it enacted section 7611(d).  (*Charisma*, *supra*, 175 Cal.App.4th at p. 372.)

Despite the family law court's references in this case to the "liberal" standard applied in cases involving the former legitimation statute, the fact is the court applied the standard currently applied in section 7611(d) cases, as articulated in *Charisma*:  "receipt of the child into the home must be sufficiently unambiguous as to constitute a clear declaration regarding the nature of the relationship, but it need not continue for any specific duration."  (*Charisma*, *supra*, 175 Cal.App.4th at p. 374.)  In this case, the family law court set forth a list of activities by Jason that unambiguously demonstrated a parental relationship

with Gus during his visits at Jason's New York apartment.[15] Danielle's assertion that Jason's conduct was no different than the conduct of a boyfriend of the child's mother ignores the activities the court identified, and instead focuses only on what Jason did *not* do. But a parent need not be a perfect parent to be found to have received a child into his or her home. He or she simply must demonstrate a parental relationship, however imperfect. Substantial evidence supports the family law court's finding that Jason did so in this case.

3.     *The court properly applied the requirement that the parent hold the child out as his or her own*

Addressing the "holds out" requirement, the court observed that "the evidence showing Jason was not committed to being a parent to Gus at the time of his conception or his birth is strong. . . . Although he told a few close friends Danielle was expecting his child, he was very selective in the people he chose to make his announcement and became upset when Danielle told others. Nonetheless, by December 2011, if not earlier, he was actively holding out Gus as his child." In support of its finding that Jason held Gus out as his child no later than December 2011, the court cited the fact that Jason went on a tour of Little Dolphins School that month, signed the school enrollment forms in February 2012, and made a tuition payment. The court concluded:

---

[15] As such, Danielle's argument that the family law court misapplied the receiving requirement because it did not find that Jason had a parental relationship at the time he received Gus into his home is contrary to the record.

"The fact is Jason publicly acknowledged Gus as his child to the school. Moreover, the school personnel believed Jason to be Gus' father."

Danielle argues that the court's finding was improper because Jason did not demonstrate that he "unequivocally displayed [a father-son] relationship to the community at large"; she contends that "[t]he family court did not find that Jason did anything more than belatedly identify Gus as his biological offspring." We disagree.

First, Danielle cites to no law to support her assertion that a presumed father *must* display his relationship with his child "to the community at large," and we have found none. Jason was not required to "display" his relationship to the general public. Indeed, having grown up the child and grandchild of celebrities, Jason expressed his desire to protect Gus from the pressures of being the son of a celebrity – a desire shared by many celebrities.[16]

Second, Danielle's contention that the court "did not find that Jason did anything more than belatedly identify Gus as his biological offspring" is demonstrably false. There is no question that Jason's conduct relating to the Little Dolphins school that the court cited in support of its finding is conduct demonstrating a parental relationship,

---

[16] See, e.g., http://articles.latimes.com/2014/jan/31/entertainment/la-et-mg-kristen-bell-dax-shepard-magazine-boycott-today-20140131 [celebrities call for a boycott of publications that publish paparazzi photographs of their children].

rather than merely a biological relationship. That evidence is sufficient to support the court's finding.[17]

4. *Jason's initial rejection of a parental relationship does not preclude a finding that he is a presumed parent based upon later conduct*

Danielle contends the court's finding that Jason was a presumed parent was improper because he had "categorically stated that he would *not* be conscripted into fatherhood," and he did not attempt to engage in conduct demonstrating a parental relationship (if at all) until well after Gus' birth. She argues that allowing a sperm donor who previously rejected a parental relationship to later seek such a relationship undermines the certainty given to the mother under section 7613(b) regarding the sperm donor's rights. We find no error.

As we noted in our earlier decision, "it [is not] necessary for the person seeking presumed parent status to have entered into the familial relationship from the time of conception or birth." (*Jason P. I*, *supra*,

---

[17] Danielle's argument that Jason's conduct was similar to the men seeking presumed parentage in *In re Sarah C.* (1992) 8 Cal.App.4th 964 and *In re Spencer W.* (1996) 48 Cal.App.4th 1647, in which the appellate courts found the conduct was insufficient to establish presumed parentage, is unavailing. As the court in *Charisma* explained, the appellate courts in those cases "were reviewing trial court decisions *rejecting* presumed parentage claims. [Citations.] Accordingly, the reviewing courts were obliged to make all inferences in favor of the trial court findings that the alleged fathers had *not* established their presumed parentage claims. In this case, we are obliged to make all factual inferences in favor of the trial court's finding that [the alleged parent] made the showing required by section 7811(d)." (*Charisma, supra*, 175 Cal.App.4th at p. 377.)

36

226 Cal.App.4th at p. 177.)  The fact that Jason initially rejected the idea of being a father is irrelevant because – with Danielle's encouragement and permission – he slowly developed a father-son relationship with Gus.  The state has an interest in protecting those kinds of relationships, even when they are belatedly developed, because they """"give young children social and emotional strength and stability.""""" (*In re Nicholas H.*, *supra*, 28 Cal.4th at p. 65.)

Allowing Jason to seek presumed parentage after he initially rejected the idea of being a parent does not undermine the certainty granted by section 7613(b).  Contrary to Danielle's assertion, Jason did not "unfairly ambush[] Danielle with his belated claim for custody." From the time Gus was born in December 2009 until shortly before Jason filed his petition in June 2012, Danielle encouraged Jason to establish a paternal relationship with Gus.  She referred to Jason as Gus' "Dada."  She allowed Jason to come to her house "a lot" to spend time with Gus in the first few months and asked Jason to watch Gus while she went for a jog or to yoga class, and was pleased that he was "getting attached" to Gus.  She kept Jason apprised of medical issues regarding Gus, and allowed him to accompany Gus to appointments with his pediatrician, identifying Jason to the pediatrician as Gus' father.  She told her father in January 2011 that she intended for "Gus to have two full-time and fully-devoted parents."  She, Jason, and Gus went on vacations together as a family.  In short, far from being ambushed, Danielle fully supported Jason's developing relationship with Gus.

5.     *The court's reliance on Danielle's behavior was not improper*

Finally, Danielle contends the family law court improperly relied upon Danielle's conduct, rather than focusing only on Jason's conduct in determining whether Jason was a presumed parent.  The court's reliance on Danielle's conduct not only was not improper, it was required under the circumstances of this case.

As we explained in our earlier opinion, "[o]ur holding that a sperm donor is not precluded from establishing presumed parentage does not mean that a mother who conceives through assisted reproduction and allows the sperm donor to have some kind of relationship with the child necessarily loses her right to be the sole parent.  [¶]  . . .  A mother wishing to retain her *sole* right to parent her child conceived through assisted reproduction can limit the kind of contact she allows the sperm donor to have with her child to ensure that the relationship does not rise to the level of presumed parent and child."  (*Jason P. I*, *supra*, 226 Cal.App.4th at p. 178.)

The family law court's examination of Danielle's conduct was appropriate and necessary to determine whether Danielle attempted to limit the kind of contact Jason had with Gus to protect her right to be Gus' sole parent.  The court properly found the evidence established that far from trying to limit Jason's contact to avoid establishing a parental relationship, Danielle promoted the establishment of such a

38

relationship.[18]  Having found that, with Danielle's support and approval, Jason received Gus into his home, held Gus out as his son, and had a parental relationship with him, the court properly declared Jason the presumed father of Gus.

B.    *Custody Issues*

1.    *Law governing custody*

In making a custody determination, the family law court must make an award that is in the best interests of the child based upon all the circumstances.  (*Burchard v. Garay* (1986) 42 Cal.3d 531, 534; *Keith R. v. Superior Court* (2009) 174 Cal.App.4th 1047, 1050 (*Keith R.*).)  "The purpose is to maximize the child's opportunity to develop into a stable, well-adjusted adult.  The child's welfare is paramount and the 'overarching concern.'  [Citation.]  Relevant factors include the child's health, safety and welfare, the nature and contact with the parents, and any history of abuse by one parent against the child or other parent.  (§ 3011.)  And the so-called 'friendly parent' provision requires the court to consider 'which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent . . . .'  (§ 3040, subd. (a)(1).)"  (*Keith R., supra,* 174 Cal.App.4th at p. 1053.)

---

[18]    We note the concerns expressed by amicus curiae Choice Moms LLC that our decision here (and our prior decision) puts at jeopardy the rights of women who choose to be single mothers.  But we have made clear that women can protect those rights by limiting the kinds of contact they allow the sperm donor to have with the child.  Danielle simply did not do so in this case.

Section 3044 establishes "a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child. . . . This presumption may only be rebutted by a preponderance of the evidence." (§ 3044, subd. (a).) The statute provides seven factors the court is to consider in determining whether the presumption has been overcome. (§ 3044, subd. (b).)

2. *The family law court's findings*

In considering the health, safety, and welfare of Gus, the family law court found that both parents are capable of caring for Gus' physical needs, based upon the care Jason provided Gus during the period he had visitation and the care Danielle has provided throughout his life. But the court also found that "[b]oth parents demonstrated some deficits in their respective abilities to be protective and supportive of Gus emotionally." It found these deficits were evidenced in at least four ways: (1) neither parent had sought advice from mental health professionals as to how they should discuss Jason's re-entry into Gus' life or how to address "the many references about this litigation now populating the Internet" that Gus is likely to read at some point; (2) the tension between the parents "was palpable," as both were still extremely angry and distrustful of the other, which poses a danger to Gus' emotional well-being; (3) Jason's level of anger toward Danielle resulted in him engaging in conduct that resulted in the issuance of a one-year domestic violence restraining order in November 2013 and the renewal of that order in December 2014; and (4) both parents "engaged

40

in a media campaign which was largely driven by their own emotional needs, rather than concern for Gus," which "is now chronicled on the Internet for Gus (and his friends) to read in the years ahead."

The court also found that Jason was more likely to facilitate Gus' relationship with Danielle. It found that "[b]y her conduct Danielle demonstrated that she intended to restrict Jason's time with Gus." It noted that through her testimony, Danielle made it clear that "she does not support Gus having a relationship with [Jason] because she fears that Jason will relay to Gus a 'false narrative' rather than her version of the facts related to the parties' relationship." The court observed that the evidence "compels the conclusion that [Danielle] does not support Gus' relationship with Jason and will likely not do so once the litigation is concluded."

Addressing Jason's history of abuse, the court first observed that "[i]n considering whether the [§ 3044] presumption against joint legal or physical custody has been or can be rebutted, it is important to understand the form that the domestic violence took. There is insufficient evidence of any physical violence, and Judge Moloney expressly rejected such a finding. Rather, what marked this relationship was that Jason engaged in inappropriate verbal harassment of Danielle and disturbed her peace when he did not get his way." The court noted that Jason had recently begun taking domestic violence classes, but this was insufficient to rebut the presumption against joint custody "at this time." Instead, the court found that "Jason needs to engage in therapy directed to helping him understand that simple insistence together with disrespectful language is not

41

appropriate if one is attempting to raise a child with another parent. [¶] Further, in part because of Jason's conduct, the parties have a great deal of trouble communicating. It also [is] true, however, that Danielle did not respond to Jason's reasonable inquiries. . . . Both parties[] contribute to the communication difficulties."

The court concluded that "vesting sole legal custody with Danielle, together with a period of counseling for both parties . . . , followed by joint custody is in Gus' best interest, for several reasons. [¶] First, successful completion of a parenting class may rebut the presumption against joint custody. [Citing § 3044, subd. (b)(4).] . . . [¶] Second, it is in Gus' best interest to reduce the level of conflict between the parties, particularly related to the litigation. Thus, it is in Gus' best interest to provide a self-executing mechanism regarding future joint legal custody following counseling, as well as a step-up parenting plan. . . . [¶] Third, there is no showing that communication between the parties so as to exercise joint custody will compromise Danielle's safety. Considering the form the domestic violence took, completion of individual counseling by Jason and participation in joint counseling by both parties will be sufficient to rebut the presumption against joint custody. [¶] Finally, as described above, Jason is the parent more likely to facilitate Gus' relationship with the other parent. In these circumstances shared physical custody is thus ultimately in Gus' best interest. The sharing of joint physical custody, without joint legal custody, would present numerous practical difficulties which would not benefit Gus."

3.   *Danielle's arguments on appeal*

a.   *Arguments raised in appellant's opening brief*

Danielle contends in her opening brief that the family law court erred by (1) concluding that the section 3044 presumption against awarding joint custody to a person who has perpetrated domestic violence carries less force when the domestic violence did not involve physical violence; and (2) ordering joint custody before Jason presented evidence that he had successfully completed the treatment to address his anger issues.

With regard to Danielle's first contention, we do not read the court's discussion regarding Jason's domestic violence as concluding that the section 3044 presumption carried less force because it did not involve physical violence.  Rather, we understand the court's observations about the conduct that led to the domestic violence finding to have been made in the context of determining what should be required to rebut the section 3044 presumption.

For example, one of the factors the court must consider in determining whether the presumption is rebutted is whether the domestic violence perpetrator has successfully completed a batterer's treatment program.  (§ 3044, subd. (b)(2).)  The court reasonably could conclude, in light of the absence of evidence of physical violence, that completion of a batterer's treatment program was not necessary to rebut the presumption, and instead that completion of a program of counseling to address the kind of harassment involved in this case was sufficient.  We find no error in this conclusion.

Danielle's second contention has some merit. At the time the court entered its custody order, it found that Jason had not yet rebutted the section 3044 presumption, but that the presumption *would* be rebutted once Jason completed six months of individual counseling focusing on helping him to develop tools to deal with his anger and frustration, and he and Danielle participated in joint counseling focused on raising the level of trust between them and improving their communication. The court also found it was in Gus' best interest to provide a self-executing mechanism for future joint legal custody, because "[a]ny other result would require that the court make only interim orders that would result in further litigation and again raise the level of parental conflict, which is not beneficial to Gus."

The court was rightly concerned about making an order designed to avoid further litigation. The animosity shown by the parties in this litigation – who had spent almost $6 million in attorney fees by the time judgment was entered – was substantial. But as beneficial as it might be to Gus to avoid further litigation, the section 3044 presumption must be rebutted by evidence. (See § 3044, subd. (a) ["This presumption may only be rebutted by a preponderance of the evidence"].) And at the time it made its custody order, the court had not yet received any evidence that Jason (and Danielle) had participated in the counseling needed to rebut the presumption. Therefore, the court was not empowered to award joint custody to Jason, even if that joint custody was to be delayed for six months.

Our conclusion that the court could not award Jason joint custody at the time it entered the custody order does not mean that the order

must be unconditionally reversed in its entirety. Two years have passed since the order was entered. If, during these two years, Jason has completed the ordered individual counseling and he and Danielle have participated in the ordered joint counseling, there would be no need to disturb the custody order. Therefore, we will conditionally reverse the order and remand the matter with directions to the family law court to conduct limited proceedings to make a determination based on evidence as to whether the ordered counseling has been completed such that the section 3044 presumption has been rebutted.[19] The court has discretion to limit the scope and nature of the evidence necessary to make this determination. If the court determines the section 3044 presumption has been rebutted, the court may reinstate the custody order. If the court determines the presumption has not been rebutted, it shall enter a new custody order, taking into account that the section 3044 presumption has not yet been rebutted.

> b. *Arguments raised in appellant's reply brief*

In addition to the two contentions she asserted in her opening brief, Danielle raised two new arguments regarding the custody order in her appellant's reply brief. She argues that the family law court erred by considering which parent was more likely to facilitate Gus'

---

[19] Although Jason's counsel stated at oral argument that the family law court has already made this determination, there is nothing in the record before us to verify counsel's statement. If the family law court has, in fact, received evidence of Jason's completion of the counseling the court deemed necessary to rebut the section 3044 presumption, it need not hold another hearing and may instead simply reinstate the custody order.

relationship with the other parent in making its custody order, in contravention of section 3044, subdivision (b)(1) (hereafter, section 3044(b)(1)) (citing *Ellis v. Lyons* (2016) 2 Cal.App.5th 404 (*Ellis*)), and by ordering a "2-2-5" visitation schedule[20] despite the section 3044 presumption (citing *Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655 (*Celia S.*)).

Ordinarily, we would not consider arguments raised for the first time in a reply brief, "'because such consideration would deprive the respondent of an opportunity to counter the argument.'" (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) But we will consider them in this case because the arguments are based upon two cases that were decided after the opening brief was filed; we need not provide Jason an opportunity to counter the arguments because they do not affect the outcome of this case.

As to Danielle's first argument, we disagree with parts of the analysis in the case upon which she relies, and in any event, the case is distinguishable.

In *Ellis*, the mother and father shared joint legal and physical custody of their child. (*Ellis*, *supra*, 2 Cal.App.5th at p. 407.) After the father got into a physical altercation with his adult brother-in-law in the child's presence, the mother obtained a domestic violence abuse prevention order from a court in Massachusetts, where she lived. (*Id.* at pp. 407, 409.) The mother then filed in California a request for

---

[20] Under a 2-2-5 schedule, each parent has the child for two days every week, and they alternate weekends.

46

modification of the child custody and support orders, seeking sole legal and physical custody of the child, with supervised visitation in Massachusetts for the father. (*Id.* at pp. 410-411.) The family law court in California conducted an evidentiary hearing regarding the incident on which the domestic violence order was based, and found that the incident lasted less than one minute, there were no injuries, and the child was not harmed and did not fear for her safety. (*Id.* at p. 413.) It concluded that the child's best interests would not be served by restricting the father's custodial rights. (*Id.* at p. 414.) The court made no reference to section 3044 in its ruling, and expressly relied upon section 3040[21] in concluding that denial of the mother's request for sole custody was in the child's best interest. (*Ibid.*)

Our colleagues in Division Five found the family law court committed reversible error by relying on section 3040 in determining the best interests of the child because it was precluded from doing so by section 3044(b)(1). (*Ellis, supra,* 2 Cal.App.5th at pp. 414, 417-418.)

The court began its analysis by stating: "The outcome of this appeal turns almost entirely on the dictates of section 3044. The statute establishes a rebuttable presumption that joint or sole custody for a parent who has perpetrated domestic violence is not in a child's

---

[21] Section 3040, subdivision (a)(1) creates a preference for custody to both parents jointly or to either parent, and instructs that "[i]n making an order granting custody to either parent, the court shall consider, among other factors, which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent."

best interests.[22]  This presumption, which shifts the usual burden of persuasion, need only be rebutted by a preponderance of the evidence. But what a court may not do under the statute – and what the family law court did here – is rely 'in whole or in part' on section 3040's preference for frequent and continuing contact with the noncustodial parent.  (§ 3044, subd. (b)(1).)"  (*Ellis*, *supra*, 2 Cal.App.5th at p. 414.)

The court found that despite the family law court's belief that the incident at issue did not rise to the level of domestic violence, the issuance of a domestic violence abuse prevention order by the Massachusetts court meant that the section 3044 rebuttable presumption necessarily applied.  (*Ellis*, *supra*, 2 Cal.App.5th at p. 416.) The appellate court observed that there was no indication that the family law court applied the section 3044 presumption or expressly considered the factors that section 3044 directs a court to consider in determining whether the presumption has been rebutted, and noted that other courts have held that this alone warrants reversal.  It suggested that, due to the extensive findings made by the family law court, it might have been inclined "to parse those findings to determine whether the family law court implicitly considered all of the applicable

---

[22]  Actually, the court misstates the presumption.  The presumption is that an award of sole or joint custody to a perpetrator of domestic violence "is detrimental to the best interest of the child."  (§ 3044, subd. (a).)  Although the difference between the court's statement of the presumption and the statutory language is subtle, it is an important difference for purposes of rebuttal of the presumption.  Rebuttal merely requires a showing that awarding custody is *not detrimental to* the child's best interests; it does not require a showing that awarding custody *is* in the child's best interests.

statutory factors and found the presumption rebutted." (*Ellis, supra*, 2 Cal.App.5th at p. 417.) It declined to do so, however, "because it is clear there was error here – the family law court expressly relied on a consideration section 3044 forbids." (*Ibid.*)

The court then quoted the relevant part of section 3044: "'In determining whether the presumption set forth in subdivision (a) has been overcome, the court shall consider all of the following factors: [¶] (1) Whether the perpetrator of domestic violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child. In determining the best interest of the child, *the preference for frequent and continuing contact with . . . the noncustodial parent, as set forth in paragraph (1) of subdivision (a) of Section 3040, may not be used to rebut the presumption, in whole or in part.*'" (*Ellis, supra*, 2 Cal.App.5th at p. 417, quoting § 3044, subd. (b).) The court concluded: "Because the family law court expressly considered . . . section 3040[, subdivision (a)(1)] when deciding Mother's request for sole custody . . . , and because section 3044 prohibits such consideration 'in whole or in part,' the conclusion is inescapable: the family law court's ruling is predicated on an erroneous understanding of applicable law." (*Id.* at pp. 417-418.)

We agree that the family law court in *Ellis* committed reversible error (the error being the failure to consider section 3044's presumption at all), but we disagree with our colleague's analysis to the extent it appears to hold that in making a custody determination, section 3044 forbids the court from considering section 3040's preference for frequent and continuing contact with a noncustodial parent, even if the section

49

3044 presumption has been rebutted. In our view, by their plain meaning, the interplay of sections 3040 and 3044 works as follows.

Under section 3040 (and other provisions of the Family Code – sections 3011, 3020, and 3041), a custody finding is to be made based on the best interests of the child. In determining the best interests of the child, section 3040, subdivision (a)(1) expresses a policy preference for frequent and continuing contact with a noncustodial parent. It does so by requiring the court, in determining whether to grant custody to either parent, to consider which parent is more likely to permit the child to have frequent and continuing contact with the noncustodial parent.

However, in the case of a parent who has been found to have perpetrated domestic violence against the other parent, section 3044, subdivision (a) expresses a limited exception to section 3040's policy preference. It does so by means of a rebuttable presumption that sole or joint custody with the offending parent is detrimental to the child's best interest. One of the ways in which the presumption may be rebutted is by a preponderance of the evidence (§ 3044, subd. (a)) that shows sole or joint physical custody with the offending parent *is* in the child's best interest (§ 3044(b)(1)). But in determining whether there has been such a showing, section 3044(b)(1) prohibits the court from using, in whole or

in part, section 3040's preference for frequent and continuing contact with the noncustodial parent.[23]

Significantly – and this is a point apparently overlooked in *Ellis* – section 3044(b)(1)'s prohibition against considering section 3040's preference for frequent and continuing contact applies only in the context of determining whether the presumption of subdivision (a) of section 3044 – that an award of sole or joint physical custody to the offending parent is detrimental to the child's best interests – has been rebutted. Once the presumption has been rebutted (a finding that must be made without consideration of section 3040's preference), the case becomes like any other in determining what custody arrangement is in the best interests of the child. As such, before making an order granting custody to either parent, the court must consider, under section 3040, subdivision (a)(1), which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent.

In *Ellis,* as the appellate court noted, the family law court did not consider the section 3044 presumption in determining custody. (*Ellis, supra,* 2 Cal.5th at p. 414.) Thus, the error in *Ellis* was not that the family law court violated section 3044(b)(1) by relying on section 3040 in determining whether the section 3044 presumption was rebutted; rather, the error was that the court failed to consider the presumption

---

[23]    We note that although section 3044, subdivision (b) requires the court to *consider* the factors it lists, it does not require the court to find they all have been satisfied in order to find the presumption rebutted. The court simply must find, by a preponderance of the evidence, that awarding custody to the domestic violence perpetrator would not be detrimental to the child's best interests.

at all. To the extent *Ellis* goes beyond this error and appears to hold that section 3044 prohibits the court from considering section 3040's preference when making the ultimate determination of custody, after the presumption of section 3044 is rebutted, we conclude it is inconsistent with the meaning of section 3044.

In the present case, the family law court addressed the section 3044 presumption, and expressly found that it would be rebutted by Jason's completion of individual counseling and both parties' participation in joint counseling. Although we have concluded that the court could not award Jason joint custody based upon its finding that the presumption *would* be rebutted, it is possible that on remand the court will find that the presumption now has been rebutted. In that event, it would be appropriate for the court to rely upon section 3040, among other things, in determining what custody arrangement would be in Gus' best interests, and the custody order may be reinstated.

Danielle's second argument raised for the first time in her reply brief may have some merit to the extent we have concluded that the family law court did not have authority to award joint custody based upon its finding that the section 3044 presumption *would* be rebutted. She argues that the family law court abused its discretion by ordering a 2-2-5 visitation schedule despite the section 3044 presumption, relying upon *Celia S.*, *supra*, 3 Cal.App.5th 655.

In *Celia S.*, the mother and the father stipulated to joint legal and physical custody of their two children, "with a '50/50 timeshare' under which the children alternated weeks with each parent." (*Celia S.*,

*supra*, 3 Cal.App.5th at p. 658.)  After an incident of domestic violence, the mother sought a domestic violence restraining order against the father.  (*Id.* at p. 659.)  The trial court issued a temporary restraining order, then held an evidentiary hearing.  (*Ibid.*)  The court found that the mother was a victim of domestic violence, issued a domestic violence restraining order, and ordered the father to complete a 52-week batterer intervention program.  (*Id.* at p. 660.)  The court awarded the mother sole legal and physical custody, but ordered that the father would have visitation and left the "50/50 timeshare" arrangement in place.  (*Ibid.*)

The appellate court found that the trial court's visitation order violated section 3044 because it effectively awarded joint physical custody despite the section 3044 presumption.  (*Celia S.*, *supra*, 3 Cal.App.4th at p. 663.)  The court noted that "[u]nder the Family Code, "'[j]oint physical custody" means that each of the parents shall have significant periods of physical custody.' [Citations.]  [¶]  . . . 'Where children "shuttle[] back and forth between two parents" [citation] so that they spend nearly equal times with each parent, or where the parent with whom the child does not reside sees the child four or five times a week, this amounts to joint physical custody.' [Citations.]  [¶] In contrast, where 'a father has a child only 20 percent of the time, on alternate weekends and one or two nights a week, this amounts to sole physical custody for the mother with "liberal visitation rights" for the father.' [Citations.]" (*Id.* at pp. 663-664.)

In this case, the family law court ordered a step-up parenting plan in which Jason would have very limited visitation with Gus at the beginning, with small increases every seven weeks, until it reached a 2-2-5 visitation schedule after 21 weeks (or just over 5 months). Given our conclusion that the court could not award Jason joint custody based upon its finding that the presumption would be rebutted after he completed six months of counseling, it appears that the court abused its discretion in making this order. However, like Danielle's previous argument, any error will be harmless if, on remand, the court determines the section 3044 presumption has been rebutted.

//

//

//

//

//

//

//

//

//

//

//

//

//

## DISPOSITION

The judgment is affirmed as to the parentage finding, but is conditionally reversed as to the award of custody. On remand, the family law court is directed to conduct limited proceedings to determine whether Jason completed the requirements necessary to rebut the section 3044 presumption, unless it has already conducted such proceedings and made that determination. The court has discretion to limit the scope and nature of the evidence necessary to make this determination. If the court determines or has determined that Jason has completed those requirements, it may reinstate its award of joint custody. If the court determines or has determined that he has not done so, it shall enter a new custody order, taking into account that the section 3044 presumption has not yet been rebutted. Jason P. shall recover his costs on appeal.

**CERTIFIED FOR PUBLICATION**

WILLHITE, J.

We concur:

EPSTEIN, P. J.          MANELLA, J.

55